# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

ENVIRONMENTAL JUSTICE HEALTH )
ALLIANCE; CENTER FOR COMMUNITY )
ACTION AND ENVIRONMENTAL JUSTICE; )
EAST YARD COMMUNITIES FOR )
ENVIRONMENTAL JUSTICE; NEW JERSEY )
ENVIRONMENTAL JUSTICE ALLIANCE; )
TEXAS ENVIRONMENTAL JUSTICE )
ADVOCACY SERVICES; NATURAL )
RESOURCES DEFENSE COUNCIL, INC.; )
NATIONAL AUDUBON SOCIETY; NEW )
YORK CIVIL LIBERTIES UNION; SIERRA )
CLUB, )
                                )
           Plaintiffs, )
     v. )
                                )
COUNCIL ON ENVIRONMENTAL QUALITY )
                                )
and )
                                )
MARY B. NEUMAYR, in her official capacity )
as Chairman of the Council on Environmental )
Quality, )
                                )
           Defendants. )

**COMPLAINT**

Case No. 20-cv-6143

## INTRODUCTION

1.    The National Environmental Policy Act (NEPA) establishes "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348

(1989). It declares the federal government's responsibility to act "as [a] trustee of the environment for succeeding generations" and to use "all practicable means" to "assure . . . safe, healthful, productive, and esthetically and culturally pleasing surroundings," 42 U.S.C. § 4331. Whether NEPA is implemented to meet those goals, or to defeat them, is the question at stake in this litigation. And it is a question of critical importance to the health and well-being of Plaintiffs' members and communities.

2.     In section 102 of NEPA, Congress required every federal agency to prepare a "detailed statement by the responsible official," 42 U.S.C. § 4332(2)(C), regarding a proposed project's environmental impacts, so that agencies will make fully informed and well-considered choices, before resources are committed. *Id.* § 4332(2)(C)(i). Through this mechanism, Congress intended NEPA to serve as "an environmental full disclosure law" that enables the public to "weigh a project's benefits against its environmental costs." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985). Congress also intended NEPA environmental review to ensure "the integrity of the agency process," forcing agencies to "face" rather than "ignor[e]" "stubborn, difficult-to-answer objections." *Id.*

3.     NEPA does not require particular substantive outcomes, but it does require federal agencies to "take a 'hard look' at the environmental effects of their planned action[s]" before approving them. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). "Simply by focusing the agency's attention on the environmental consequences of a proposed project"—by requiring preparation of a "detailed" environmental impact statement before projects that may have significant environmental impacts are approved—"NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 348-49; *see* 42 U.S.C. § 4332.

4.     Countless unnecessary environmental harms—including deadly air pollution in residential communities already overburdened by environmental hazards; the individually small but cumulatively devastating climate change impacts of dirty fuels; and the piecemeal destruction of the habitat of species on the brink of extinction—have been identified, disclosed, and often avoided, simply because NEPA requires federal agencies to think before they act.

5.     Ultimate responsibility for interpreting and enforcing NEPA falls to the federal courts. *See, e.g.*, *Robertson*, 490 U.S. at 355-56; *NRDC v.*

3

*Callaway*, 524 F.2d 79, 86 (2d Cir. 1975); *cf. Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981); *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

6.     For forty-two of NEPA's fifty years, the federal judiciary's enforcement of NEPA has been informed by interpretive regulations issued by the Council on Environmental Quality (CEQ). 43 Fed. Reg. 55,978 (Nov. 29, 1978). CEQ's 1978 regulations endured, almost unchanged, through administrations both Republican and Democratic, through times of economic downturn as well as expansion. The courts gave CEQ's regulations "substantial deference" when the regulations had a "well-considered basis." *Robertson*, 490 U.S. at 355-56.

7.     From 1978 through 2020, CEQ's regulations reinforced NEPA's salutary goals. In July 2020, however, CEQ promulgated a new rule (the 2020 Rule), 85 Fed. Reg. 43,304 (July 16, 2020), that attempts to reinterpret and revise the statute, and to eviscerate many of NEPA's well-established, judicially recognized protections. The 2020 Rule purports to bind every other federal agency.

8.     The 2020 Rule, if implemented, will eliminate environmental reviews for entire classes of projects that may have devastating cumulative or indirect impacts on people and the environment. It purports to authorize

federal agencies to ignore serious environmental impacts that those agencies have in the past been obliged to identify and consider. And, in direct opposition to NEPA's goal of facilitating public participation, the 2020 Rule erects barriers to public engagement, curtailing the people's participation in and the judiciary's oversight of NEPA implementation. In short, the 2020 Rule requires federal agencies across the Executive Branch to stick their heads in the sand, rather than to take a "hard look" at the full health and environmental consequences of their decisions.

9.      If implemented, the 2020 Rule will cause real, foreseeable harms to people, communities, and the natural environment. It will allow ill-considered and uninformed project approvals that impair individuals' health, especially in the most vulnerable and overburdened communities. It will permit projects that divide neighborhoods and impair habitat. And it will cause agencies to disregard, rather than disclose and consider, carbon pollution that threatens the integrity of our climate. Plaintiffs know first-hand what these sorts of impacts will likely look like, because they have seen such impacts disclosed and avoided when NEPA was applied as Congress intended and as required by CEQ's 1978 regulations.

10.      Until now, NEPA reviews have served critical environmental justice, environmental health, and conservation functions. Environmental

impact statements have, for example, identified, and allowed the public and agency decisionmakers to address, the harmful cumulative impacts of new highways or chemical plants in fence-line communities that face racial and economic inequities, and that are often overburdened by multiple sources of pollution. That pollution frequently includes air contaminants; light, noise, and vibration intrusions; and exposure to hazardous and toxic chemicals from nearby legacy disposal sites, oil and gas development, power plants, refineries, incinerators, and manufacturing facilities—all of which are disproportionately sited in these neighborhoods. Many of these overburdened communities are also especially vulnerable to sea-level rise, storm surges, heat waves, and elevated urban temperatures and other impacts of climate change.

11.     Many of the most overburdened communities have predominantly Black, Latinx, and Indigenous populations who are socially vulnerable due to poverty and a lack of access to medical care, transportation, and food. These communities are often defined by years of discriminatory redlining and systemic racism in industrial development. Black, Latinx, and Indigenous people in this country live on average with 66% more air pollution than white people. CEQ's 2020 Rule will allow federal agencies to discount or disregard cumulative impacts to these

communities, and will make it more difficult for the people who live, work, worship, recreate, and attend school there to have their voices heard.

12.     Until now, NEPA reviews have also required federal agencies to identify and disclose—and, in some cases, avoid—the slow but irreversible impacts to our climate of countless separate but contemporaneous projects and approvals. NEPA has, for example, mandated that federal agencies take into account downstream powerplant emissions resulting from pipeline approvals, consider cumulative carbon pollution from relaxed vehicle fuel-efficiency standards, and disclose how fossil fuel extraction from drought-ridden western landscapes will contribute to climate change. As Congress recognized in enacting NEPA, federal agencies cannot make fully informed decisions about the complex, interrelated, and sometimes long-term impacts of their projects, unless the agencies consider those impacts.

13.     NEPA reviews have also long played a critical role in encouraging and compelling federal agencies to consider how creeping development and exploitation of landscapes and ecosystems harm our shared treasures. By demanding that agencies think before they act, NEPA has helped to protect, or at least to provide for more-informed decisions regarding, places from Long Island Sound to the environs of Yosemite. NEPA has improved decisions affecting black bear, cougars, and even

neotropical migratory birds. The statute has, in Congress's words, guided federal agencies to "fulfill the[ir] responsibilities" to act as "trustee[s] of the environment for succeeding generations." 42 U.S.C. § 4331(b)(1). The 2020 Rule chisels away at these responsibilities.

14.     CEQ's 2020 Rule seeks to revise a statute that Congress has been unwilling to repeal and rewrite. CEQ proposed its 2020 Rule immediately after President Trump gave a speech that described NEPA—as interpreted for decades by the federal courts and, through CEQ's 1978 regulations, the Executive Branch—as a "job-kill[er]" that needs to be "slash[ed]." *Remarks on Proposed National Environmental Policy Act Regulations*, Daily Comp. Pres. Doc. 1 (Jan. 9, 2020).

15.     The 2020 Rule is consistent with President Trump's campaign to rush environmental reviews forward. Exec. Order No. 13766 (Jan. 24, 2017), 82 Fed. Reg. 8657 (Jan. 30, 2017). The 2020 Rule reinforces President Trump's command to the "heads of all agencies" to "temporarily or permanently rescind, modify, waive, or exempt" regulated entities from requirements that "may inhibit" economic growth—or to decline to enforce those requirements. Exec. Order No. 13924, § 4 (May 19, 2020), 85 Fed. Reg. 31,353, 31,354 (May 22, 2020). And the 2020 Rule reiterated President Trump's order that federal agencies use "emergency procedures,

statutory exemptions, categorical exclusions, [and] analyses that have already been completed" to speed through NEPA reviews or bypass them altogether. Exec. Order No. 13927, § 6(b) (June 4, 2020), 85 Fed. Reg. 35,165, 35,167-68 (June 9, 2020). The 2020 Rule thus serves the current Administration's political and policy agenda, but it does so at the expense of Congress's goals in enacting the statute.

16.     Plaintiffs and their members are among those directly harmed by CEQ's 2020 Rule. Some of Plaintiffs' members live and work in predominantly Black, Latinx, and Indigenous communities most overburdened by the cumulative pollution and other impacts that the 2020 Rule provides for federal agencies to ignore. Some of Plaintiffs' members study, recreate in, or otherwise experience and deeply enjoy the natural landscapes and wildlife that the 2020 Rule will permit federal agencies to incrementally, and sometimes unknowingly, destroy. All of Plaintiffs' members are exposed to an increasingly disrupted climate and extreme weather, the aggravation of which the 2020 Rule tells federal agencies to disregard. Plaintiffs therefore bring this suit to protect their members' health and well-being, and to prevent the harm to their own missions and the drain on their resources that the Rule will cause.

17.     Under the standards of the Administrative Procedure Act (APA), these defects render the 2020 Rule illegal. The 2020 Rule is arbitrary, capricious, contrary to law, and in excess of statutory authority. 5 U.S.C. § 706(2). It should now be vacated.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331. CEQ's 2020 Rule is subject to judicial review under the APA as a final agency action for which there is no other adequate remedy. 5 U.S.C. § 704. The relief sought is authorized by 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

19.     Venue is proper in the U.S. District Court for the Southern District of New York because Plaintiffs Natural Resources Defense Council, Inc.; National Audubon Society; and New York Civil Liberties Union maintain their principal place of business in the City of New York, within the boundaries of this judicial district, 28 U.S.C. § 1391(c)(2), and because this is a civil action brought against an agency of the United States and officers of the United States acting in their official capacities, 28 U.S.C. § 1391(e)(1)(C).

## PARTIES

20.    Plaintiff Environmental Justice Health Alliance (EJHA) is a collective of community-based environmental and economic justice organizations located around the country. These organizations work to eliminate the disproportionate impacts of chemical exposure and other environmental harms on people of color and low-income communities that often shoulder an inordinate burden from legacy contamination sites. EJHA provides capacity support and space for connecting grassroots and environmental justice advocacy groups with one another and with researchers or other experts in order to help transform EJHA's affiliates' local areas into healthy, sustainable, and just communities for youth, elders, and families. As part of its work, EJHA relies on data from NEPA environmental studies to educate the public, its partners, and government officials about the risks posed by proposed projects to surrounding communities.

21.    EJHA regularly participates in the environmental review processes of major federal actions under NEPA to ensure that agencies fully consider the environmental consequences of proposed actions, and to educate EJHA's members and the general public about the environmental and human health consequences of those actions.

22.   EJHA bring this action on its own behalf. The 2020 Rule perceptibly impairs EJHA's ability to achieve its mission by frustrating the activities it carries out in furtherance of its mission, as well as by causing it to divert resources to counteract the harms caused by the Rule.

23.   The 2020 Rule perceptibly impairs EJHA's mission by depriving it of information about the environmental impacts of federal actions that it uses to educate its members, government officials, and the broader public. Under the 2020 Rule, federal agencies will no longer have to analyze and disclose the cumulative and indirect impacts of their actions. Without information about the cumulative and indirect impacts of federal actions—information that NEPA requires federal agencies to analyze and publicly disclose—EJHA will not be able to fulfill its educational mission.

24.   The 2020 Rule further impairs EJHA's ability to carry out its mission by causing it to divert its resources from its core activities in order to address the informational deficits caused by the Rule. Because federal agencies will not analyze and disclose the cumulative and indirect impacts of their projects, EJHA will have to expend and divert its resources to provide its members the technical information needed to fully understand the health and environmental impacts of federal actions. And since EJHA

already operates with very limited resources, it will have to divert these resources from core activities.

25.    Plaintiff Texas Environmental Justice Advocacy Services (T.e.j.a.s.) was established in 2006, and is the only community-based, grassroots organization solely dedicated to the issues of environmental justice in the Houston Ship Channel. T.e.j.a.s. is dedicated to providing community members with the tools necessary to create sustainable, environmentally healthy communities by educating individuals on health concerns and implications arising from environmental pollution, empowering individuals with an understanding of applicable environmental laws and regulations and promoting their enforcement, and offering community-building skills and resources for effective community action and greater public participation. T.e.j.a.s. is based in Houston, Texas, serving communities at the frontlines of pollution from the oil and gas industry who shoulder the health and environmental burdens caused by the over 2,500 chemical facilities in the area. T.e.j.a.s. is an affiliate member of EJHA.

26.    T.e.j.a.s. regularly participates in the environmental review processes of major federal actions under NEPA to ensure that agencies fully consider the environmental consequences of proposed actions, and to

educate T.e.j.a.s.'s members and the general public about the environmental and human health consequences of those actions.

27.    T.e.j.a.s. members, including Yvette Arellano, are harmed by the 2020 Rule. Ms. Arellano is a resident of Houston, Texas, who, like many other members of T.e.j.a.s., lives, recreates, and works near superfund sites such as the U.S. Oil Recovery Superfund site and the San Jacinto Waste Pits Superfund site, and is affected by benzene plumes originating in the Houston Ship Channel's many refineries. Ms. Arellano lives with polycystic ovary syndrome, a hormonal disorder that is often caused and exacerbated by environmental contaminants found in polluted water, food, and air. Ms. Arellano lives, recreates, engages in cultural and religious ceremonies, and works near the Port of Houston. The Port is the proposed site of the Houston Ship Expansion Channel Improvement Project—a plan to expand the Port's ship channel in order to accommodate some of the largest cargo vessels in the world.

28.    The Port of Houston is the largest container port in the Gulf Coast, handling nearly 70% of the U.S. Gulf's container traffic. By widening and deepening the ship channel, this project will likely increase the amount of cargo processed, transported, and stored by the Port, leading to a rise in emissions from ships, trucks, cranes, and other cargo-handling equipment

needed to process incoming and outgoing cargo. And since the Port is a major center for the worldwide oil and petrochemical industries, the Project will also result in more pollution from additional oil processing and refining.

29.     Although the channel expansion project has already undergone NEPA review, other current and future projects will be needed to handle the anticipated future growth at the terminal, including expansion of gate facilities, rehabilitation and repair of wharves, and construction of new roads and container yards. These other projects, if approved, could cause cumulatively significant adverse pollution impacts and indirect flooding impacts from increased development that will injure Ms. Arellano and other T.e.j.a.s. members. Under CEQ's 2020 rule, federal agencies will not have sufficient information to make fully informed decisions that account for these types of impacts.

30.     Ms. Arellano is reasonably concerned that, as a result of the 2020 Rule, environmental review of projects necessary to handle the anticipated future growth at the Port of Houston will fail to consider the cumulative and indirect impacts of these projects, along with other factors that federal agencies would have had to consider but for their compliance with the 2020 Rule. Ms. Arellano is concerned that without this

information, she and other similarly situated T.e.j.a.s. members will lack the information they need to fully understand the health and environmental impacts of projects at the Port of Houston, information they also need to take self-protective measures against the harms caused by increased air pollution, and from industrial development prone to flooding, hurricanes, and other disasters.

31.    Ms. Arellano is also concerned that, without this information, decisionmakers will be more likely to make less health and environmentally protective decisions, which would in turn harm her and other T.e.j.a.s. members' health, safety, and aesthetic interests. These harms are intensified by the concurrent risk of contracting and dying from COVID-19; a risk that is higher for people of color living in communities that—like Ms. Arellano's—are exposed to disproportionately higher levels of air pollution.

32.    Ms. Arellano is also concerned that, as a result of the 2020 Rule, NEPA review of projects in the Port of Houston will not adequately consider the indirect impacts of increasing ship traffic, which in turn increases the risk of accidents in the Houston Ship Channel. In 2019, nine barges became unmoored due to heavy winds and currents. Two barges loaded with naphtha and other toxic chemicals slammed onto the I-10 San Jacinto bridge, shutting down the highway, which is a major thoroughfare

and evacuation route. Because of the increasing incidence of flooding and storms in the Houston area, Ms. Arellano is reasonably concerned that failure to account for the indirect impacts of increased traffic in the Houston Ship Channel will lead to these indirect impacts being overlooked by decisionmakers, causing more such accidents in the future, and jeopardizing her and her community's ability to evacuate during future natural disasters.

33.    Ms. Arellano is concerned that, as a result of the 2020 Rule, environmental reviews for projects that induce increased rail traffic in the Port of Houston will fail to adequately consider impacts on public transportation. It is not unusual for freight trains servicing the Port of Houston to block traffic, often for hours, from accessing the communities closest to the Port. Because the unpredictability of train traffic and the systemwide impacts of delays, the Metropolitan Transit Authority of Harris County has closed some of the bus stops that service these communities. Ms. Arellano is reasonably concerned that, if NEPA review of new projects with the potential to increase rail traffic do not account increased rail traffic and other indirect effects, more bus stops will be closed, harming her and the many elderly and disabled members of her community that rely on public transportation.

17

34.    Ms. Arellano also fears that under the 2020 Rule, environmental review of projects in or near the Port will not take into account their indirect effects on food safety. Ms. Arellano, like many individuals in her community, rely on locally grown food, locally raised livestock, and locally caught fish. She is reasonably concerned that additional air and water pollution will affect the reliability and safety of her local food sources.

35.    Ms. Arellano is also reasonably concerned that further development in the Houston Ship Channel will injure her religious and spiritual interests. Ms. Arellano exercises cultural traditions of water ceremonies at El Jardin Beach and Pine Gully Park in Seabrook, Texas. Ms. Arellano meets with others to pick up nurdles in this location. Ms. Arellano is concerned that the approval of projects along the Houston Ship Channel that are less protective of the environment will result in increased water pollution in the areas where she participates in water ceremonies, lessening her enjoyment of these places and, in turn, harming her religious and spiritual interests.

36.    T.e.j.a.s. also brings this action on its own behalf, as the Rule perceptibly impairs T.e.j.a.s.'s ability to achieve its mission by frustrating the activities it carries out in furtherance of its mission. By eliminating the

requirement that federal agencies consider the cumulative and indirect impacts of their actions, among other factors that federal agencies would have had to consider but for the 2020 Rule, the Rule frustrates T.e.j.a.s.'s mission by depriving it of information it needs to fully understand the health and environmental impacts of proposed actions and to educate its members.

37.     Plaintiff East Yard Communities for Environmental Justice (EYCEJ) is an environmental health and justice nonprofit organization working towards a safe and healthy environment for communities that are disproportionally suffering the negative impacts of industrial pollution. EYCEJ was established in 2002, and is based out of East Los Angeles, Southeast Los Angeles, and Long Beach, California. EYCEJ recognizes and promotes full and authentic community participation in making policies that affect them directly, promoting the implementation of environmental justice guidelines for local, state, and federal governments and agencies, as well as industry. EYCEJ utilizes research-based information, workshops, and trainings to empower its communities, preparing its constituents to engage in decisionmaking processes that directly impact their health and quality of life.

38.    EYCEJ regularly participates in the environmental review processes of major federal actions under NEPA to ensure that agencies fully consider the environmental consequences of proposed actions, and to educate EYCEJ's members and the general public about the environmental and human health consequences of those actions.

39.    EYCEJ members like Taylor Thomas are harmed by the 2020 Rule. Ms. Thomas is a resident of Long Beach, California, and lives within 2,000 feet of the I-710 freeway—the largest freight corridor in the country, and the site of a proposed freeway expansion project. The purpose of this project is to expand the freeway to sixteen lanes to accommodate more truck traffic from and to the ports of Long Beach and Los Angeles, the largest port complex in the country, accounting for nearly forty percent of the nation's total containerized import traffic and twenty-five percent of its total exports.

40.    The I-710 expansion project is currently undergoing NEPA review. President Donald Trump's Executive Order 13927 orders the Secretary of Transportation to "use all relevant emergency and other authorities to expedite work on, and completion of, all authorized and appropriated highway and other infrastructure projects that are within the authority of the Secretary to perform or to advance." Under Executive

Order 13927, the Department of Transportation can be expected to apply the 2020 Rule to the NEPA review of the I-710 expansion project.

41.    Ms. Thomas is reasonably concerned that, as a result of the 2020 Rule, environmental review of the I-710 expansion project will fail to consider the cumulative and indirect impacts, as well as other factors that would have had to be considered but for the 2020 Rule, caused by construction and operation of the project and by emissions from the additional truck traffic near her home. The 2020 Rule will thus deprive her of information she needs to understand the health impacts of the project. Because she suffers from asthma, a condition which is triggered and exacerbated by air pollution, the informational deficit caused by the 2020 Rule will deprive Ms. Thomas of information she would otherwise use to plan and take self-protective measures to counteract the harms caused by increased air pollution.

42.    Ms. Thomas is also concerned that, without complete information about the environmental impacts of federal actions, decisionmakers would be more likely to make less health and environmentally protective decisions, which would in turn harm her and other EYCEJ members' health and aesthetic interests.

43.    EYCEJ also brings this action on its own behalf, as the Rule perceptibly impairs EYCEJ's ability to achieve its mission by frustrating the activities it carries out in furtherance of its mission.

44.    EYCEJ relies on NEPA environmental review documents, including cumulative and indirect impact analyses, to identify risks, determine its advocacy priorities, and educate members about the impacts of proposed federal actions. Under the 2020 Rule, however, federal agencies will no longer have to consider the cumulative and indirect impacts of major federal actions, as well as other factors that federal agencies would have had to consider under NEPA but for their compliance with the 2020 Rule. This will impede EYCEJ's work by depriving it of vital information it uses to guide its work. Further, the 2020 Rule frustrates EYCEJ's educational mission by depriving it and its members of information necessary to understand the cumulative health and environmental impacts of proposed federal actions.

45.    Plaintiff New Jersey Environmental Justice Alliance (NJEJA) is an alliance of New Jersey-based organizations working together to identify, prevent, reduce, and eliminate environmental injustices that exist in communities of color and low-income communities in New Jersey. NJEJA supports community efforts to remediate, improve, and rebuild impacted

neighborhoods using the community's vision of improvement, through education, advocacy, review and promulgation of public policies, training, organizing, and technical assistance.

46.     NJEJA participates in the environmental review processes of major federal actions under NEPA to ensure that agencies fully consider the environmental justice and environmental consequences of proposed actions, and to educate NJEJA's members and the general public about the environmental and human health consequences of those actions.

47.     NJEJA is called upon by its members and the communities it serves to evaluate the impacts of proposed development projects, including but not limited to power plant projects, and projects at the Port of New York and New Jersey, and to advocate for outcomes that minimize the environmental justice and environmental health impacts of these projects on frontline communities. Environmental reviews pursuant to NEPA, and analyses of cumulative and indirect impacts in particular, are crucial to NJEJA's work, as their examination allows NJEJA to better understand the full range of effects that a project will have on communities that often suffer from multiple sources of pollution. Understanding the cumulative and indirect impacts of a project also enables NJEJA to fully educate its

members about the potential health, environmental justice, and environmental impacts of proposed actions.

48.     By eliminating the requirement that federal agencies consider the cumulative and indirect impacts of their actions, and other factors that federal agencies would have had to consider but for their compliance with the 2020 Rule, the Rule harms NJEJA and its members. The 2020 Rule perceptibly impairs NJEJA's work by depriving it of information it needs— and is entitled to—to fully evaluate the negative impacts that projects will have on communities of color and low-income communities, educate its members, and influence the federal decisionmaking process. The Rule also harms its members by depriving them of complete information about the health, environmental justice, and environmental impacts of major federal actions.

49.     Plaintiff Center for Community Action and Environmental Justice (CCAEJ) is a membership-based nonprofit environmental health and justice organization based out of Jurupa Valley, California. CCAEJ's mission is to bring communities together to find opportunities for cooperation, agreement, and problem solving in improving their social and natural environment. Since its founding in 1993, CCAEJ has worked to fulfill its mission through advocacy with and for frontline communities, by

24

educating community members about the health impacts of proposed industrial and infrastructure developments, and by training the next generation of community leaders.

50.    CCAEJ regularly participates in the environmental review processes of major federal actions under NEPA to ensure that agencies fully consider the environmental consequences of proposed actions, and to educate CCAEJ's members and the general public about the environmental and human health consequences of those actions.

51.    CCAEJ members including Sagrario Peterson, a resident of San Bernardino, California, will be harmed by the 2020 Rule. Ms. Peterson lives near Colton, California, the site of a proposed railyard project which is intended to facilitate the movement of cargo to and from the Ports of Long Beach and Los Angeles—the two busiest ports in the country. The proposed railyard will be built in very close proximity to communities already overburdened by pollution. Construction and operation of this rail yard will bring more truck traffic to this area, increasing air pollution and exacerbating the health harms suffered by Ms. Peterson and other CCAEJ members who live in or near Colton, California.

52.    Ms. Peterson is reasonably concerned that, as a result of the 2020 Rule, environmental review of the Colton railyard project and other

similar projects will fail to consider the cumulative and indirect impacts of these projects, and other factors that their lead agencies would have had to consider but for their compliance with CEQ's 2020 Rule. This will deprive Ms. Peterson, other CCAEJ members, and the broader public, of crucial information about the environmental impacts of these projects—information they also need to take self-protective measures against the effects of the additional pollution that will be emitted as a result of the proposed railyard and other similar projects.

53.    Ms. Peterson is also concerned that, without complete information about the environmental impacts of federal actions, decisionmakers will be more likely to make less health-protective and environmentally-protective decisions, which would in turn harm CCAEJ members' health and aesthetic interests.

54.    CCAEJ also brings this action on its own behalf, as the Rule perceptibly impairs CCAEJ's ability to achieve its mission by frustrating the activities it carries out in furtherance of its mission, as well as by causing it to divert resources to counteract the harms caused by the Rule.

55.    Much of CCAEJ's work involves projects or activities taking place in California's Inland Empire, a densely populated suburban area with significant industrial activity. The Inland Empire suffers from some of

the worst air pollution in the country. There, it is often the case that projects and activities, which themselves may not have significant individual environmental impacts, contribute to an already overburdened air basin, exacerbating the health dangers created by air pollution. By doing away with the requirement to consider the cumulative and indirect impacts of major federal actions, the 2020 Rule frustrates CCAEJ's mission by depriving it of crucial information necessary to educate its members about the health and environmental impacts of proposed actions.

56.    The 2020 Rule further harms CCAEJ by requiring it to divert its resources from its core activities to fill the informational gaps created by the Rule. As a small nonprofit organization, CCAEJ operates with limited funding that it uses to organize its community and create leadership development curricula. Because the 2020 Rule will result in the issuance of environmental documents lacking analysis of cumulative impacts, among other things, CCAEJ will have to divert resources from its community organizing and leadership development programs to address informational deficits caused by the Rule, such as by hiring experts to analyze health and environmental impacts agencies will no longer consider due to the Rule.

57.    Plaintiff New York Civil Liberties Union (NYCLU), the New York affiliate of the American Civil Liberties Union, is a non-profit

27

advocacy organization with 120,000 members across the state. The NYCLU's mission is to defend and promote the fundamental principles embodied in the Bill of Rights and the U.S. Constitution. The NYCLU works to identify and challenge the ideologies and impacts of racism, including racial injustice in government institutions. The NYCLU works toward this mission by advocating for all New Yorkers to have equitable access to opportunities and the ability to participate in government decisions that affect them. This includes planning and development decisions, which historically have excluded or intentionally discriminated against Black, Indigenous, and Latinx New Yorkers. The NYCLU is incorporated under the laws of the State of New York, with its principal place of business in New York, New York.

58.    The I-81 Viaduct Project, led by the New York State Department of Transportation ("NYSDOT") and the Federal Highway Administration, is a proposed reconstruction or replacement of the elevated portions of Interstate 81 that cuts through the center of Syracuse, New York. The original construction of I-81 in the 1960's destroyed approximately 500 homes and businesses in a majority Black neighborhood. Its construction, compounded by past redlining and urban renewal efforts, severed the Black neighborhood from wealthier white parts of Syracuse. The NYCLU has been

involved in the I-81 Viaduct Project redevelopment planning to ensure an equitable process that does not disproportionately harm the Black community adjacent to the I-81 Viaduct.

59.    The I-81 Viaduct Project is currently undergoing NEPA review. President Donald Trump's Executive Order 13927 orders the Secretary of Transportation to "use all relevant emergency and other authorities to expedite work on, and completion of, all authorized and appropriated highway and other infrastructure projects that are within the authority of the Secretary to perform or to advance." Under Executive Order 13927, the Department of Transportation can be expected to apply the 2020 Rule to the NEPA review of the I-81 Viaduct Project. On information and belief, the I-81 Viaduct Project will be expedited pursuant to the Executive Order.

60.    NYCLU members like Antwanette Johnson are harmed by the 2020 Rule. Ms. Johnson is a resident of Syracuse, New York who for twenty years has lived in public housing located less than one-hundred feet from the I-81 Viaduct. NYSDOT has designated her neighborhood, which is predominantly Black, as an environmental justice community for the NEPA review. Ms. Johnson has high blood pressure that is exacerbated by the noise pollution from the I-81 viaduct. She depends on public transportation

and walking to get to places such as doctors' appointments, work, and the grocery store.

61.    Ms. Johnson worries that increased noise pollution from the project will worsen her high blood pressure. As a result of the 2020 Rule, she is reasonably concerned the agencies will not consider the effect of increased pollution on her health.

62.    Ms. Johnson also worries about access to public transit and walkability during and after construction. As a result of the 2020 Rule, she fears that the agencies will ignore the project's impact to her access to public transportation and walkability, or otherwise degrade the quality of her neighborhood.

63.    Ms. Johnson is also concerned that, as a result of the 2020 Rule, she and other individuals will not be able to present alternative proposals for consideration. Under the 2020 Rule, the lead agency need only consider alternatives submitted during the scoping process. Since the scoping phase of the I-81 Viaduct Project has already occurred, alternatives submitted by Ms. Johnson and others in the community would not be considered by the lead agency, depriving her of a meaningful opportunity to participate. This would also deprive decisionmakers of information about all reasonable alternatives, resulting in uninformed decisionmaking and a

higher likelihood that an alternative less protective of health and environmental concerns will be selected, thus harming Ms. Johnson.

64.    Terry Cooper is also a NYCLU member who is harmed by the 2020 Rule. Mr. Cooper lives in a predominately Black neighborhood less than 150 feet from the I-81 Viaduct. NYSDOT has also designated his neighborhood as an environmental justice community for the NEPA review. He has lived in the same home for twenty-six years and has a fixed income. Recently, he was diagnosed with cancer.

65.    Mr. Cooper is concerned about the 2020 Rule's impact on the I-81 Viaduct Project. He worries the agency will not consider the cumulative impact of lead exposure from both the redevelopment and other sources. His neighborhood already is a "hot spot" for lead and increased lead pollution may lead to hazardously high levels of exposure.

66.    Mr. Cooper also worries the agencies will not consider impacts related to changes in land use if the viaduct is replaced and he and other Black residents are displaced (as they were when the I-81 viaduct originally was built). Mr. Cooper is further concerned the agencies will not disclose information about these impacts to him or his community, preventing them from participating adequately in the review or taking necessary self-protective measures.

67.    Similar development projects to remove elevated highways that historically segregated low-income communities of color from more affluent neighborhoods are in the initial planning stages in Rochester and Buffalo, New York.

68.    In Rochester, the NYCLU is participating in the early planning stages to replace the northern section of the Inner Loop highway to ensure an equitable process for the Black community adjacent to the highway. The 2020 Rule will harm NYCLU and its members in the Rochester area because the environmental review for this project will not consider cumulative or indirect impacts on the community, and they will lack critical information to fully participate in the decision or take necessary self-protective measures.

69.    In Buffalo, the NYSDOT has secured initial state funding to consider the feasibility of reconstructing a portion of Route 33. This project runs through a predominantly Black neighborhood and will ultimately receive some federal highway funds. The NYCLU and its members are reasonably concerned that, as a result of the 2020 Rule, NEPA review of this project will not occur. Because the 2020 Rule unlawfully exempts from NEPA review non-federal projects with "minimal Federal funding" but does

not define "minimal Federal funding," there is a significant risk that the Route 33 project will be exempt from NEPA review.

70.    Even if NEPA review of the New York Route 33 project occurs, however, the 2020 Rule will harm NYCLU and its members in Buffalo because they will lack critical information about the project's cumulative and indirect impacts they need to effectively participate in the NEPA process. Decisionmakers also will lack that information.

71.    The NYCLU also brings this action on its own behalf. The 2020 Rule impairs the NYCLU's ability to achieve its mission to advance racial justice by frustrating the activities it carries out in furtherance of its mission, as well as by causing it to divert resources to counteract the harms caused by the 2020 Rule.

72.    Because agencies will not be required to disclose cumulative or indirect effects of projects, the NYCLU will lack information about proposed projects that it needs to educate impacted communities and to advocate for alternatives or mitigation that takes into account historic and current effects of racism. The NYCLU will have to divert resources from its community organizing and public education campaigns to fill this gap, such as by hiring additional experts to analyze the impacts agencies will no longer consider.

73.     Because the 2020 Rule also imposes barriers to public participation and requires comments to "specifically analyze environmental issues" the NYCLU will be unable to ensure that the vulnerable communities most impacted by development projects can effectively participate in the NEPA process.

74.     The 2020 Rule will cause the NYCLU to divert its resources and lose investments it has made in preparing for a full environmental review of the I-81 Viaduct Project. The NYCLU has dedicated two full-time employees to ensure that the Black community next to the viaduct has a full and fair opportunity to participate in the decision and to ensure the harms to their community are considered. To that end, the NYCLU has held over 100 meetings to educate and gather input from the community on the project. If the 2020 Rule is applied to the I-81 Viaduct Project, much of the NYCLU's investments will be lost, since the agencies will no longer consider cumulative or indirect harms and the public's opportunity to participate will be severely curtailed.

75.     Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a national, nonprofit environmental membership organization whose purpose is to safeguard the Earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC was founded in 1970

34

and is organized under the laws of the State of New York. NRDC is headquartered in New York, NY, and maintains offices in other locations within the United States and abroad. NRDC has hundreds of thousands of members nationwide, including many in this judicial district. For more than 50 years, NRDC has worked to strengthen and enforce bedrock environmental laws such as NEPA.

76.    NRDC regularly participates in the environmental review processes of major federal actions under NEPA to ensure that agencies fully consider the environmental consequences of proposed actions, and to educate NRDC's members and the general public about the environmental and human health consequences of those actions.

77.    NRDC has individual members, including Buffalo, Wyoming, resident Daniel Hengel, whose informational, aesthetic, and recreational interests are harmed by the 2020 Rule. Mr. Hengel often visits Wyoming's Powder River Basin, which he uses and enjoys for a variety of purposes, including birding, hiking, hunting, quiet contemplation, and aesthetic appreciation. Mr. Hengel enjoys traveling to northwest Wyoming, near the Little Powder River, to observe the fall bird migration. He intends to continue visiting these lands during the fall to observe the many species that make their annual southern migration. And at least twice each month,

Mr. Hengel drives through the Thunder Basin National Grassland; he always carries his binoculars and stops to observe Ferruginous Hawks and the many other raptors that frequent this area.

78.    The Powder River Basin is one of the most productive oil and gas basins in Wyoming, and public land parcels within the Basin are subject to quarterly oil and gas lease sales. Before these quarterly lease sales occur, the Wyoming state office of the Bureau of Land Management has in the past conducted a NEPA review of the proposed sale, studying, among other things, the cumulative and indirect impacts of leasing public lands for oil and gas development. The Bureau will continue to regularly conduct such quarterly lease sales into the indefinite future, and would continue to conduct NEPA reviews on each of these lease sales except to the extent CEQ's 2020 Rule eliminates, reduces, or otherwise limits the Bureau's obligation to do so. Thousands of such parcels are located in the Thunder Basin National Grasslands and near Little Powder River. Many of the parcels proposed by the Bureau for future oil and gas development are located in the Basin, in areas where Mr. Hengel regularly travels and expects to continue to travel for birding, hunting, and hiking.

79.    Mr. Hengel is reasonably concerned that, as a result of the 2020 Rule, environmental review of future lease sales of parcels for oil and gas

development will fail to consider the cumulative and indirect impacts of these projects, and other factors that the Bureau would have had to consider but for Bureau compliance with the 2020 Rule, thus depriving him, the broader public, and decisionmakers of crucial information about their environmental impacts. Further, Mr. Hengel is concerned that, as a result of the barriers to public participation created by the Rule, governmental decisionmakers will approve more oil and gas development projects in the Powder River Basin without having before them a complete analysis of the likely environmental consequences of these actions, harming his recreational and aesthetic interests.

80.   Other NRDC members, including Ann Campbell, are also harmed by the 2020 Rule. Ms. Campbell is a resident of Davis, California. She lives and recreates near the Sacramento-San Joaquin Delta (Delta)— the site of the proposed Delta Conveyance Project—where Ms. Campbell, and thousands of similarly situated NRDC members, enjoy boating, fishing, and observing aquatic life on the Delta, as well as birding, hiking, and running, along the Delta.

81.   According to the California Department of Water Resources, the purpose of the Delta Conveyance Project is to develop a new water diversion and conveyance facilities in the Delta to meet the reliability needs

of water deliveries under the California State Water Project and potentially the federal Central Valley Project. The Department of Water Resources submitted a permit application under Section 404 of the Clean Water Act to the U.S. Army Corps of Engineers to request authorization for the proposed project. NEPA requires that the federal permitting agencies conduct environmental impact review under NEPA before granting permit approvals for the Delta Conveyance Project. Federal permitting agencies have routinely conducted NEPA reviews for other new water diversion and conveyance facility projects in the Delta in the past. On information and belief, federal permitting agencies, including the Army Corps of Engineers, intend to conduct an environmental impact review under NEPA of the proposed Delta Conveyance Project, although no Notice of Intent has yet issued.

82.   Ms. Campbell is reasonably concerned that, as a result of the 2020 Rule, the environmental review of the Delta Conveyance Project under NEPA will not account for the indirect and cumulative impacts of the project, as well as other factors that federal agencies would have had to consider under NEPA but for their compliance with CEQ's 2020 Rule. She is also concerned that the Rule will deprive the public of sufficient opportunity to participate in the NEPA process, and ultimately deprive her

38

and decisionmakers of crucial information about the environmental impacts of the project. Ms. Campbell is reasonably concerned that lessened NEPA review, under CEQ's 2020 Rule, will result in the approval of a project that is less environmentally protective, leading to the degradation of the Delta's water quality and diminution of water quantity—changes that would affect the type and quantity of aquatic and bird species she can observe—as well as displacement and reduction of recreation sites. Aggravation of such impacts, which are probable effects of the Delta Conveyance Project, will injure Ms. Campbell's aesthetic and recreational interests.

83.    Danielle Waples is also among the many NRDC members harmed by the 2020 Rule. Ms. Waples lives in Beaufort, North Carolina, where she works as a researcher at the Duke University Marine Laboratory. Ms. Waples's primary study area is off the Atlantic coast, where she studies whales and dolphins. This area is also the site of presently authorized and future seismic airgun blasting—a surveying mechanism employed to detect oil and gas reserves beneath the ocean floor.

84.    In 2014, the Bureau of Ocean Energy Management (BOEM) prepared a Programmatic Environmental Impact Statement to study proposed seismic surveying off the Atlantic coast. In this environmental

impact statement, BOEM indicated that it intended "to develop site-specific environmental analyses under NEPA" to study the environmental impacts of individual seismic surveys.

85.    Ms. Waples, however, is reasonably concerned that, as a result of the 2020 Rule, some of these site-specific analyses will not occur. This is because surveying activities may occur outside of U.S. territorial waters, with effects that BOEM and the National Marine Fisheries Service (NMFS) may characterize as "located entirely outside of the jurisdiction of the United States"—activities that were previously subject to environmental review under NEPA, but that the 2020 Rule unlawfully exempts from review under NEPA.

86.    If environmental review of extraterritorial activities or decisions such as seismic surveying off the Atlantic coast does not occur, Ms. Waples will be deprived of information about the impact of these activities on marine mammals. As a result of this informational deficiency, NMFS decisionmakers will evaluate requests for incidental harassment authorizations under the Marine Mammal Protection Act without a full understanding of the impacts of seismic surveying on marine mammals. This will make it more likely that decisionmakers approve projects that are

more harmful to marine mammals, thus harming Ms. Waples's scientific, aesthetic, and recreational interests.

87.   NRDC also bring this action on its own behalf. The Rule perceptibly impairs NRDC's ability to achieve its mission by frustrating the activities it carries out in furtherance of its mission, as well as by causing it to divert resources to counteract the harms caused by the Rule.

88.   The 2020 Rule erects significant barriers to, or eliminates, public participation in many federal decisions that were, before the Rule, subject to a more complete NEPA analysis. For example, by changing the definition of "major federal actions," the 2020 Rule creates a significant risk that certain actions previously subject to NEPA will no longer undergo environmental review at all, thus depriving NRDC and the communities it represents of the ability to make their voices heard in the decisionmaking process.

89.   Further, the 2020 Rule restricts access to the courts and narrows judicial review of agency actions by, for example, establishing heightened issue-exhaustion requirements, creating an unlawful presumption of adequacy of NEPA documents, and purporting to direct how federal courts should exercise their equitable and remedial authority. As a result, the 2020 Rule frustrates NRDC's ability to participate in and

influence the NEPA review process, and ultimately restricts avenues of redress by constraining NRDC's ability to challenge the adequacy of NEPA documents in court.

90.    Additionally, the 2020 Rule frustrates NRDC's educational mission by depriving it of information about the environmental impacts of federal actions that it uses to educate its members. Under the 2020 Rule, federal agencies will not be required to prepare environmental documents (e.g., Environmental Assessments or Environmental Impact Statements) for certain actions—for example, extraterritorial actions and those no longer deemed "major Federal actions" under the 2020 Rule's new and unlawful interpretation of NEPA—that previously required preparation of environmental impact documents. For those actions that would still require preparation of an environmental document, the 2020 Rule diminishes the extent of analysis of impacts and alternatives required. By depriving NRDC of this information, which NEPA requires to be publicly disclosed, the Rule impedes NRDC's ability to educate its members about the environmental consequences of federal actions, and will require NRDC to divert resources to the development of such information itself.

91.    The Rule also impairs NRDC's ability to carry out its mission by forcing NRDC to divert its resources to counteract the effects of the Rule.

Because of the informational deficit created by the Rule, NRDC will be forced to divert its resources from other core activities to be able to study and educate its members about the environmental impacts of federal actions that will no longer be considered under the 2020 Rule, including cumulative and indirect impacts, as well as the impacts of projects that do not meet the new definition of a major federal action.

92.    Plaintiff National Audubon Society, Inc. ("Audubon") is a national nonprofit conservation organization exempt from tax under Section 501(c)(3) of the Internal Revenue Code dedicated to protecting birds and the places they need, today and tomorrow, throughout the Americas using science, advocacy, education, and on-the-ground conservation. Founded in 1905, Audubon has over 1.7 million members nationwide, including 98,631 members in New York, where it is incorporated. Among its many activities, Audubon operates 41 nature centers, and has 23 state programs, and over 450 local chapters throughout the country, including 27 in New York.

93.    Audubon regularly participates in the environmental review processes of major federal actions under NEPA to ensure that agencies fully consider the environmental consequences of proposed actions, and to

educate Audubon's members and the general public about the environmental and human health consequences of those actions.

94.    Audubon has individual members, including Brian Rutledge, Tina Toth, Richard Guenzel, and Barbara Vasquez, whose informational, aesthetic, and recreational interests are harmed by the 2020 Rule.

95.    Mr. Rutledge lives in Wyoming, where he enjoys birdwatching, hiking, and hunting. For the past 15 years, Mr. Rutledge has visited lands around Casper, Wyoming, in the Wind River area, and in the Powder River Basin for these purposes, and plans to return within the next year.

96.    Ms. Toth is a resident of Sheridan, Wyoming. She moved there to be able to enjoy the many outdoor experiences that the state has to offer, including hiking, camping, birding, and photographing wildlife—activities which bring her joy and improve her quality of life. Ms. Toth often visits the Powder River Basin and the Thunder Basin National Grassland several times a year for these recreational purposes, and intends to continue doing so this year and for many years to come.

97.    Mr. Guenzel is a resident of Laramie, Wyoming. He enjoys hiking, hunting, fishing, birding, rockhounding, and photographing nature near Casper, Wyoming, in the Powder River Basin, and in the Bighorn

Basin area, and he intends to return in the next year to enjoy the significant nature and wildlife resources offered by these places.

98.     Ms. Vasquez is a resident of Jackson County, Colorado. She regularly recreates in the North Park area and around the Arapaho National Wildlife Refuge in Jackson County, and plans to return within the next six months to enjoy the many natural resources and recreational opportunities that these lands have to offer.

99.     The areas where Mr. Rutledge, Ms. Toth, Mr. Guenzel, and Ms. Vasquez recreate include lands that are currently being considered for oil and gas development by the Bureau of Land Management (BLM). Under federal law, the BLM is required to hold quarterly lease sales of parcels for oil and gas development. Before these quarterly lease sales occur, the BLM has in the past conducted a NEPA review of the proposed sale, studying, among other things, the cumulative and indirect impacts of leasing public lands for oil and gas development. Audubon, on behalf of its members, regularly comments on and engages in these sales. The Bureau will continue to regularly conduct such quarterly lease sales into the indefinite future, and would continue to conduct NEPA reviews on each of these lease sales except to the extent CEQ's 2020 Rule eliminates, reduces, or otherwise limits the Bureau's obligation to do so.

45

100.   Mr. Rutledge, Ms. Toth, Mr. Guenzel, and Ms. Vasquez are reasonably concerned that as a result of the 2020 Rule, environmental review of future lease sales of parcels for oil and gas development will fail to consider the cumulative and indirect impacts of these projects, and other factors that the BLM would have had to consider but for its compliance with the 2020 Rule, thus depriving them, the broader public, and decisionmakers of crucial information about the environmental impacts of oil and gas development. Further, they are concerned that, as a result of the barriers to public participation created by the Rule, governmental decisionmakers will approve more oil and gas development projects in the areas where they recreate without having before them a complete analysis of the likely environmental consequences of these actions, thus harming their recreational and aesthetic interests.

101.   Audubon also brings this action on its own behalf. The 2020 Rule perceptibly impairs Audubon's ability to achieve its mission by frustrating the activities it carries out in furtherance of its mission, as well as by causing it to divert resources to counteract the harms caused by the Rule.

102.   The 2020 Rule frustrates Audubon's educational mission by depriving it of information about the environmental impacts of federal

46

actions that it uses to educate its members. Under the Rule, federal agencies will not be required to prepare environmental documents for certain actions—for example, those actions no longer deemed "major" under the Rule's new and unlawful interpretation of NEPA—that previously required preparation of environmental impact documents. For those actions that would still require preparation of an environmental document, the Rule diminishes the extent of analysis of impacts and alternatives required. By depriving Audubon of this information, which NEPA requires to be publicly disclosed, the Rule impedes Audubon's ability to educate its members about the environmental consequences of federal actions, and will require Audubon to divert resources to the development of such information itself.

103.   Further, the 2020 Rule erects significant barriers to, or eliminates, public participation in many federal decisions that were, before the Rule, subject to a more complete NEPA analysis. For example, by changing the definition of "major federal actions," the 2020 Rule creates a significant risk that certain actions previously subject to NEPA will no longer undergo environmental review at all, thus depriving Audubon and its members of the ability to make their voices heard in the decisionmaking process.

104.   The 2020 Rule also seeks to limit access to the courts and narrows judicial review of agency actions by, for example, establishing heightened issue exhaustion requirements, creating an unlawful presumption of adequacy of NEPA documents, and purporting to direct how federal courts should exercise their equitable and remedial authority. As a result, the 2020 Rule frustrates Audubon's ability to participate in and influence the NEPA review process, and ultimately restricts avenues of redress by constraining Audubon's ability to challenge the adequacy of NEPA documents in court.

105.   Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization, with over 800,000 members across the country. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. For decades, Sierra Club has used the traditional tools of advocacy—organizing, lobbying, litigation, and public outreach—to combat federal actions that harm public health and the environment and to educate its members about the effects of

these activities. Sierra Club is incorporated under the laws of the State of California, with its principal place of business in Oakland, California.

106.   Sierra Club has individual members, including Laramie, Wyoming, resident Connie Wilbert, whose informational, aesthetic, and recreational interests are harmed by the 2020 Rule. Ms. Wilbert often visits public lands across the state of Wyoming, which she uses and enjoys for many purposes, including camping, hiking, wildlife watching, hunting, quiet contemplation, and aesthetic appreciation. Ms. Wilbert especially enjoys frequent visits to the northern Red Desert in central Wyoming, appreciating its beautiful scenery and unparalleled opportunities for wildlife watching. She enjoys seeing the northern Red Desert's unique desert elk herds, healthy populations of sage grouse, mule deer following traditional migration routes through the area, and rare spade-foot toads in spring fed pools in the sand dunes, to name just a few. Although less frequently, she also visits public lands in the southern Big Horn Basin and on the Thunder Basin National Grasslands, enjoying the scenic beauty and abundant wildlife in those areas as well.

107.   The Powder River Basin is one of the most productive oil and gas basins in Wyoming, and public lands within the Basin are subject to quarterly oil and gas lease sales. Before these quarterly lease sales occur,

49

the Wyoming state office of the Bureau of Land Management has, in the
past, conducted a NEPA review of the proposed sale, studying, among other
things, the cumulative and indirect impacts of leasing public lands for oil
and gas development. The Bureau will continue to regularly conduct such
quarterly lease sales into the indefinite future, and would continue to
conduct NEPA reviews on each of these lease sales except to the extent the
2020 Rule eliminates, reduces, or otherwise limits the Bureau's obligation
to do so. Thousands of such parcels are located in the Thunder Basin
National Grasslands and near Little Powder River. Many of the parcels
proposed by the Bureau for future oil and gas development are located in
the Basin, in areas where Ms. Wilbert regularly travels and expects to
continue camping, hiking, viewing wildlife, hunting, and enjoying the land.

108.   Ms. Wilbert is reasonably concerned that, as a result of the
Final Rule, environmental review of future lease sales of parcels for oil and
gas development will fail to consider the cumulative and indirect impacts of
these projects, and other factors that the Bureau would have had to
consider but for Bureau compliance with the 2020 Rule, thus depriving her,
the broader public, and decisionmakers of crucial information about the
projects' environmental impacts. Further, Ms. Wilbert is concerned that, as
a result of the barriers to public participation created by the Rule,

governmental decisionmakers will approve more oil and gas development projects throughout Wyoming, in particular in the Powder River Basin, without having before them a complete analysis of the likely environmental consequences of these actions. This would lessen Ms. Wilbert's enjoyment of these lands, harming her recreational and aesthetic interests.

109.   Sierra Club also brings this action on its own behalf. The 2020 Rule perceptively impairs Sierra Club's ability to achieve its mission by frustrating the activities it carries out in furtherance of its mission, as well as by causing it to divert resources to counteract the harms caused by the Rule.

110.   The 2020 Rule erects significant barriers to, or eliminates, public participation in many federal decisions that were, before the Rule, subject to a more complete NEPA analysis. For example, by changing the definition of "major federal actions," the 2020 Rule creates a significant risk that certain actions previously subject to NEPA will no longer undergo environmental review at all, thus depriving Sierra Club and its members of the ability to make their voices heard in the decisionmaking process.

111.   Additionally, the 2020 Rule frustrates Sierra Club's educational mission by depriving it of information about the environmental impacts of federal actions that it uses to educate its members. Under the Rule, federal

agencies will not be required to prepare environmental documents for certain actions—for example, extraterritorial actions and those no longer deemed "major" under the Rule's new and unlawful interpretation of NEPA—that previously required preparation of environmental impact documents. For those actions that would still require preparation of an environmental document, the 2020 Rule diminishes the extent of analysis of impacts and alternatives required. By depriving Sierra Club and its members of this information, which NEPA requires to be publicly disclosed, the Rule impedes Sierra Club's ability to educate its members and the public about the environmental consequences of federal actions, and will require Sierra Club to divert resources to the development of such information itself.

112.   Defendant CEQ is an agency within the Executive Office of the President of the United States. CEQ was established by NEPA. *See* 42 U.S.C. § 4342. Congress has delegated to CEQ the duties and functions set out in NEPA section 204. *See id.* § 4344.

113.   Defendant Mary B. Neumayr is Chairman of CEQ. She is sued in her official capacity. When CEQ promulgated the 2020 Rule, and throughout the federal government's fiscal year ending September 30, 2020, Congress has granted to the Chairman of CEQ "all powers, functions,

and duties" of CEQ. *See* Further Consolidated Appropriations Act, 2020, Pub. L. 116-94, 133 Stat. 2534, 2735 (2019).

## LEGAL BACKGROUND

### A.    National Environmental Policy Act

114.   Congress passed NEPA in 1969 "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of" humankind. 42 U.S.C. § 4321.

115.   The Act declares a "continuing responsibility of the Federal Government to . . . fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b). In recognition of that responsibility, the statute imposes on the federal government an obligation "to create and maintain conditions under which man and nature can exist in productive harmony," *id.* § 4331(a), and to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," *id.* § 4331(b)(2).

116.   Section 102 of NEPA requires each federal agency to prepare a "detailed statement by the responsible official" of the environmental impacts of any proposed major federal action significantly affecting the environment. 42 U.S.C. § 4332(2)(C). This statement—commonly known as

an environmental impact statement—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii).

117.    NEPA commands that each environmental impact statement address, among other factors, "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." 42 U.S.C. § 4332(2)(C)(ii), (iv).

118.    NEPA further requires that, for "any proposal which involves unresolved conflicts concerning alternative uses of available resources," federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E).

119.    NEPA's requirement to prepare an environmental impact statement "serves NEPA's 'action-forcing' purpose" of "ensur[ing]" that federal decisionmakers "will have available, and will carefully consider, detailed information concerning significant environmental impacts" before approving new projects. *Robertson*, 490 U.S. at 349.

120.    NEPA's environmental review process also "gives the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process,' and, perhaps more significantly, provides a

springboard for public comment." *Robertson*, 490 U.S. at 349 (internal citation omitted).

121.   Section 102 of NEPA requires each federal agency to "develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking." 42 U.S.C. § 4332(2)(B). Congress directed each federal agency to develop its NEPA procedures "in consultation with" CEQ. *Id.*

## B.   The Administrative Procedure Act

122.   The APA makes judicial review available to any "person suffering legal wrong because of agency action." 5 U.S.C § 702.

123.   Under the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations and quotations omitted). In reviewing that explanation, courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

124.   A "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

## FACTUAL BACKGROUND

### A.   CEQ's guidelines and prior regulations

125.    For the first eight years after NEPA's enactment, CEQ issued no regulations. During that time, CEQ issued "Guidelines" to be used by other agencies in shaping their implementation of the statute. CEQ first issued NEPA guidelines in 1971. *See* 36 Fed. Reg. 7724 (Apr. 23, 1971). CEQ amended its NEPA guidelines in 1973. *See* 38 Fed. Reg. 20,550 (Aug. 1, 1973).

126.   In 1977, President Carter directed CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA]." Exec. Order No. 11,991 (May 24, 1977), 42 Fed. Reg. 26,967,

26,967. Executive Order 11,991 also directs all federal agencies to "comply with the regulations issued by [CEQ] except where such compliance would be inconsistent with statutory requirements." *Id.*

127.   CEQ issued its first regulations implementing NEPA in 1978. 43 Fed. Reg. 55,978 (Nov. 29, 1978). These 1978 regulations set out procedures and standards for preparation of environmental impact statements and related documents.

128.   To help ensure that NEPA's broad mandate was realized, the 1978 regulations defined what impacts an environmental impact statement must assess; accommodated public involvement; and put limits on agency authority to delegate the preparation of environmental impact statements to private project proponents.

129.   CEQ's 1978 regulations provided that an environmental impact statement was required where the agency reasonably anticipated "a cumulatively significant impact on the environment." 40 C.F.R. §§ 1508.11, 1508.27(b)(7) (1978); *see also* 42 U.S.C. § 4332(2)(C).

130.   CEQ's 1978 regulations defined "cumulative impact" to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such

other actions," including "individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (1978).

131.   Prior to 2020, CEQ had amended its 1978 regulations only twice. In 1986, CEQ amended 40 C.F.R. § 1502.22, styled "Incomplete or unavailable information." *See* 51 Fed. Reg. 15,618, 15,625 (Apr. 25, 1986). In 2005, CEQ amended 40 C.F.R. § 1506.9, styled "Filing requirements." *See* 70 Fed. Reg. 41,148, 41,148 (July 18, 2005). Unless otherwise indicated, when this complaint refers to CEQ's "1978 regulations," it is referring to the regulations CEQ promulgated in 1978, as amended in 1986 and 2005.

**B.    CEQ's 2020 Rule**

132.   In June 2018, CEQ provided advance notice of its intention to amend its 1978 regulations. *See* 83 Fed. Reg. 28,591 (June 20, 2018).

133.   On January 9, 2020, President Trump announced that "we're taking another historic step in our campaign to slash job-killing regulations" by "issuing a proposed new rule under the National Environmental Policy Act to completely overhaul the dysfunctional bureaucratic system that has created these massive obstructions." *Remarks by President Trump, supra* ¶ 14. President Trump pointed to the speed with which the Golden Gate Bridge, Hoover Dam, and the Empire State Building were constructed. *Id.* The Golden Gate Bridge was completed in

1937, Hoover Dam was completed in 1936, and the Empire State Building was completed in 1931—all decades before Congress enacted NEPA. Without acknowledging that Congress had adopted a new policy for the United States when it enacted NEPA, President Trump stated that his administration had prioritized "fixing" what he called a "regulatory nightmare." *Id.*

134.   The following day, on January 10, 2020, the Federal Register published CEQ's proposed rule revising its 1978 regulations. *See* 85 Fed. Reg. 1684 (Jan. 10, 2020). More than a million members of the public, including Plaintiffs, provided comments on the proposed rule. *See, e.g.*, Ex. A, NRDC Comments on Proposed Revisions to Regulations Implementing the National Environmental Policy Act (Mar. 10, 2020) (attachments omitted); Ex. B, Moving Forward Network Comments on Notice of Proposed Rulemaking (Mar. 10, 2020) (attachments omitted); Ex. C, 327 Organizations and Tribal Nations Comments on Proposed Rulemaking (Mar. 10, 2020) (attachments omitted); Ex. D, New Jersey Environmental Justice Alliance Comments on Proposed Rulemaking (Mar. 10, 2020) (attachments omitted); Ex. E, WE ACT for Environmental Justice et al. Comments on Proposed Rulemaking (Mar. 10, 2020) (attachments omitted).

135.   On June 4, 2020, President Trump issued an executive order directing that federal agencies "use, to the fullest extent possible and consistent with applicable law, emergency procedures, statutory exemptions, categorical exclusions, analyses that have already been completed, and concise and focused analyses" to propel forward federal actions that are subject to environmental review under NEPA. *See* Exec. Order No. 13,927, 85 Fed. Reg. 35,165, 35,167-68 (June 4, 2020).

136.   On July 16, 2020, CEQ published its 2020 Rule in the Federal Register. *See* 85 Fed. Reg. at 43,304.

137.   The 2020 Rule undermines NEPA's mandate, and conflicts with decades of judicial precedent interpreting the statute. The 2020 Rule limits the number and nature of projects subject to NEPA analyses. It eliminates the requirement that, when NEPA reviews are conducted, agency environmental documents consider the cumulative and indirect effects of the proposed projects. It raises barriers to public participation; allows private, self-interested project proponents to draft environmental documents for federal agencies; and attempts to constrain judicial oversight of NEPA compliance.

138.   Citing Executive Order 11,991, the 2020 Rule states that it "bind[s]" all federal agencies to comply with its terms in "implementing the

procedural provisions of [NEPA]." 85 Fed. Reg. at 43,358; *see also id.* at

43,373-74. CEQ did not explain how, in its view, any specific statutory

provision might support CEQ's authority to bind other federal agencies.

## C.   CEQ's elimination of the requirement to consider cumulative impacts and indirect effects of an action

139.   It has long been CEQ's position that "the most devastating

environmental effects may result not from the direct effects of a particular

action, but from the combination of individually minor effects of multiple

actions over time." CEQ, Considering Cumulative Effects Under the

National Environmental Policy Act 1 (Jan. 1997).

140.   CEQ further stated that "demographic, geographic, economic,

and human health and risk factors all contribute to whether the populations

of concern face disproportionately high and adverse effects." *Id.* at 27.

141.   CEQ's 1978 regulations required environmental documents to

consider both cumulative impacts and indirect effects. 40 C.F.R. §§ 1502.16,

1508.7, 1508.8, 1508.27(b)(7).

142.   The 2020 Rule eliminates the definition of cumulative impact

and the requirement to consider such impacts. 85 Fed. Reg. at 43,375.

143.   The 2020 Rule also eliminates all references to "indirect"

effects, 85 Fed. Reg. at 43,331, 43,343, and revises the definition of "effects"

to include only effects that are "reasonably foreseeable and have a

reasonably close causal relationship to the proposed action or alternatives."
*Id.* at 43,343.

144.   Under the 2020 Rule, "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA." 85 Fed. Reg. at 43,375. The 2020 Rule states: "Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or [that] would occur regardless of the proposed action." *Id.*

145.   CEQ states that "analysis of cumulative effects . . . is not required under NEPA." *Id.* at 43,344. CEQ also states that agency analyses "should not go beyond the definition of effects" in CEQ's 2020 Rule. *Id.* Thus, under the 2020 Rule, agencies may not consider cumulative impacts when determining whether a project will have a significant environmental impact.

146.   CEQ justifies its elimination of the requirement to consider cumulative impacts and indirect effects of a project by stating that "the terms 'indirect' and 'cumulative' have been interpreted expansively

resulting in excessive documentation about speculative effects and leading to frequent litigation." 85 Fed. Reg. at 43,343.

147.   CEQ also justifies the change by noting that "categorizing and determining the geographic and temporal scope of [cumulative] effects has been difficult and can divert agencies from focusing their time and resources on the most significant effects." *Id.* at 43,344.

148.   These assertions—that assessing cumulative impacts and indirect effects has resulted in excessive documentation and diverted agency attention from "more important" environmental problems—are factually unsupported, unexplained, and legally insufficient to justify such a substantial change in CEQ's longstanding policy.

149.   CEQ makes no effort to explain how, and cites no evidence to support its conclusion that, the 2020 Rule's elimination of "cumulative impacts" analyses, and its replacement of CEQ's long-standing regulatory definitions of "effect" and "indirect effect" with the phrase "remote in time, geographically remote, or the product of a lengthy causal chain," *id.* at 43,375, will reduce litigation or agency confusion.

150.   CEQ fails to explain how, or even to claim that, the 2020 Rule's elimination of "cumulative impacts" analyses, and its replacement of CEQ's long-standing regulatory definitions of "effect" and "indirect effect" with

the phrase "remote in time, geographically remote, or the product of a lengthy causal chain," will not cause agencies to overlook significant environmental impacts of a project. CEQ ignores a long record of environmental documents that have successfully described significant environmental impacts because cumulative and indirect effects were specifically considered in those documents. CEQ does not explain how failure to consider significant cumulative and indirect impacts is consistent with NEPA.

151.   CEQ's elimination of the requirement to consider cumulative impacts and indirect effects is inconsistent with NEPA's statutory language—which requires a "detailed statement" of "environmental impact[s]," including "any" adverse effects of the project that cannot be avoided, 42 U.S.C. § 4332(2)(C)(i), (ii)—and the law's purpose. It is also inconsistent with decades of judicial precedent that interprets the statute to require agencies to consider the cumulative effects of an action. *See, e.g.*, *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 106-07 (1983); *Hanly v. Kleindienst*, 471 F.2d 823, 830-31 (2d Cir. 1972). CEQ has no authority to overrule this precedent.

152.   Cumulative and indirect effects are among the most significant impacts of federal projects and approvals. For example, the cumulative

impacts of multiple pollution sources, and the pollution-inducing indirect impacts of new development projects, have caused environmental justice communities—such as those represented by several Plaintiffs—to suffer under unhealthy and disproportionate pollution. Removing cumulative impacts analysis from the scope of NEPA review makes it extremely difficult, if not impossible, for federal agencies to consider the effects of a project on environmental justice communities, as NEPA requires.

153.  The cumulative effects of fossil-fuel development projects materially contribute to climate change. Environmental justice communities are disproportionately burdened by climate change, and are vulnerable to sea level rise, storm surges, increased air pollution, heat waves and elevated urban temperatures and other climate-related impacts.

154.  The cumulative impacts of degraded water quality from multiple projects harm imperiled species—such as salmon, steelhead trout, and bull trout—in downstream waters through higher collective pollution loadings. Water quality degradation also harms many environmental justice communities, including communities represented by Plaintiffs, that often rely on subsistence fishing as an important source of nutrition.

155.  The 2020 Rule's elimination of the requirement to consider cumulative impacts and indirect effects is unsupported by record evidence,

disregards factors relevant to CEQ's interpretation of NEPA, exceeds CEQ's statutory authority, and violates the standards of section 10 of the APA. 5 U.S.C. § 706(2).

**D.     CEQ's narrowed definition of major federal action**

156.   CEQ's 1978 regulations provided: "*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly." 40 C.F.R. § 1508.18 (1978). Numerous federal courts had, for decades, concurred with and adopted this interpretation of NEPA.

157.   The 2020 Rule reverses CEQ's long-standing position that a proposed federal action is a "major federal action" subject to NEPA review if it significantly impacts the human environment. In the 2020 Rule, CEQ revised the definition of a "major federal action" to mean "an activity or decision subject to Federal control and responsibility," without consideration of the impacts that follow from the action, subject to specified qualifications. 85 Fed. Reg. at 43,375.

158.   The 2020 Rule provides that "[m]ajor Federal action does not include," among other things, "[n]on-Federal projects with minimal Federal funding or minimal Federal involvement where the agency does not

exercise sufficient control and responsibility over the outcome of the project." *Id.*

159. CEQ's revised definition of major federal action will mean that fewer projects go through NEPA review. *See id.* at 43,375-76. This will mean that environmental justice communities, where projects are disproportionately located, will see a greater number of projects with less disclosure and environmental review, and suffer greater health burdens as a result.

160. CEQ purports to explain this exemption on the basis of CEQ's interpretation of certain court decisions, an unsupported assumption that the federal agency "could not influence the outcome" of the action, and CEQ's desire "to reduce costs and delays." *Id.* at 43,347.

161. CEQ has misinterpreted the body of judicial precedent interpreting the statutory phrase "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C). CEQ has identified no evidence to support the premise that an agency that is providing some level of federal funding or is otherwise involved in a project could not influence the project's outcome. And CEQ has no authority to eliminate required NEPA reviews simply to "reduce costs and delays."

162.   The 2020 Rule provides that "[m]ajor Federal action does not include," among other things, "[l]oans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance." 85 Fed. Reg. at 43,375. CEQ purports to justify this exclusion by expounding upon why it does not believe certain programs of the Farm Services Agency and of the Small Business Administration involve "sufficient" federal control and responsibility to warrant NEPA review, but provides no justification for this exclusion from the definition of "[m]ajor Federal action" as it applies to other federal loan, loan guarantee, or financial assistance programs. *Id.* at 43,348-49.

163.   Under the 2020 Rule, an action that requires some small amount of federal funding or involvement or depends upon large federal loans, and which will have devastating environmental or health effects but not "sufficient" federal control or responsibility, is no longer subject to NEPA review.

164.   CEQ argues the change in definition is required to correct a "longstanding misconstruction of the NEPA statute." *Id.* at 43,345. The longstanding "misconstruction" to which CEQ refers is the agency's own prior interpretation of the statute and that of numerous federal courts.

68

165.   In trying to justify CEQ's reversal of the long-established meaning of "major Federal action," the preamble to the 2020 Rule relies on a canon of construction that courts should, where possible, give effect to every clause and word of a statute. This canon of construction neither dictates CEQ's revised interpretation of the statute nor empowers CEQ to overrule the abundant contrary judicial precedent of the past four decades. During those decades, courts have routinely interpreted "major federal action significantly affecting the quality of the human environment" consistently with CEQ's 1978 interpretation of that phrase. These courts were undoubtedly familiar with the canon of construction CEQ now invokes. That these courts nonetheless found CEQ's 1978 interpretation persuasive—and interpreted NEPA in a manner consistent with that existing interpretation—indicates that CEQ's proposal to reverse its interpretation now is not compelled by any principle of statutory construction. CEQ has not justified its departure from this judicial precedent, and its attempt to justify its change in position improperly fails to consider that precedent as an important factor in the interpretation of NEPA.

166.   CEQ's definition of "major federal action" in its 1978 regulations is more consistent with NEPA's text and purposes than the

definition in the 2020 Rule. CEQ's revised definition of "major federal action" is also inconsistent with the language of NEPA, which requires NEPA review for actions that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

167.   The 2020 Rule's definition of "major federal action" runs counter to decades of judicial precedent stating that the statutory term "major Federal action" includes "actions with effects that may be major and which are potentially subject to Federal control and responsibility." *See, e.g.*, *Andrus v. Sierra Club*, 442 U.S. 347, 364 n.23 (1979*); Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 13 (2d Cir. 1997); *Monroe Cnty. Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 698 (2d Cir. 1972).

168.   CEQ's redefinition of "[m]ajor Federal action" in the 2020 Rule violates the standards of reasoned agency decisionmaking, is contrary to law, and exceeds CEQ's statutory authority. 5 U.S.C. § 706(2).

## E.   CEQ's failure to consider the 2020 Rule's impact on environmental justice communities

169.   Executive Order 12898 directs federal agencies to make environmental justice part of their mission, and to identify and address the disproportionate environmental and health effects of their activities. *See* Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 16, 1994).

170.   Section 1-101 of Executive Order 12898 states, "To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States and its territories and possessions, the District of Columbia, the Commonwealth of Puerto Rico, and the Commonwealth of the Mariana Islands."

171.   In 1997, CEQ published guidance directing federal agencies to consider environmental justice at "each and every step" of the NEPA process. CEQ, Environmental Justice Guidance Under the National Environmental Policy Act 8 (1997). A federal agency cannot effectively consider environmental justice "at every step" of the NEPA process, without identifying and considering the cumulative impacts of the project undergoing review. The 1997 Guidance stated that, in conducting NEPA reviews, agencies should consider "the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population and historical patterns of exposure to environmental hazards."

*Id.* at 9. The Guidance also found that "[a]gencies should recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action." *Id.*

172.   The 2020 Rule provides that "[c]umulative impact, defined in 40 CFR § 1508.7 (1978), is repealed." 85 Fed. Reg. at 43,375.

173.   In the preamble to the 2020 Rule, CEQ summarily concluded, without evidentiary support, that the 2020 Rule will "not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations." *Id.* at 43,356. CEQ's conclusion is not supported by analysis or evidence in the administrative record. CEQ's conclusion is contrary to CEQ's previous conclusions in its 1997 environmental justice Guidance and the evidence submitted by public commenters concerning the 2020 Rule.

174.   CEQ's abandonment of the requirement to consider cumulative effects will obscure the cumulative impact of multiple polluting projects within environmental justice communities, including communities where members of Plaintiffs reside, imposing significant consequences for residents, especially those that are socially vulnerable. By dispensing with the requirement to consider cumulative effects, the 2020 Rule also

undermines the requirement to consider environmental justice concerns under Executive Order 12898.

175.   CEQ's revised definition of major federal action—subjecting fewer projects to NEPA review, *see id.* at 43,375—will mean that environmental justice communities, where projects are disproportionately located, will be subject to a greater number of projects with less disclosure and environmental review, and as a result suffer greater health burdens. CEQ has failed to explain how this change will not affect environmental justice communities in a manner inconsistent with the Executive Order.

176.   The 2020 Rule reduces opportunities for public participation in the NEPA process.

177.   Although required by Executive Order 12898, CEQ did not weigh—or even consider—whether its elimination of the requirement to consider cumulative effects, the increased number of actions not subject to NEPA review, or the reduced opportunities for public participation will not cause "disproportionately high and adverse effects . . . on minority populations and low-income populations."

178.   In summarily concluding that the 2020 Rule will "not cause disproportionately high and adverse human health or environmental effects . . . on minority populations and low-income populations," CEQ

73

"entirely failed to consider an important aspect of the problem," and failed to make "a rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citations and quotations omitted).

**F.   CEQ's imposition of arbitrary time and page limits on the NEPA review process**

179.   The 2020 Rule imposes a one-year presumptive limit for the completion of an environmental assessment and a two-year presumptive limit for the completion of an environmental impact statement. 85 Fed. Reg. at 43,362-63.

180.   The 2020 Rule imposes a 75-page limit for an environmental assessment. *Id.* at 43,360. It also sets a 150-page limit for an environmental impact statement, allowing 300 pages only for "proposals of unusual complexity." *Id.* at 43,364.

181.   These time and page limits apply unless a "senior agency official" approves a longer time period or extends the page limit, on a case-by-case basis. *Id.* at 43,360, 43,362-63, 43,364. The 2020 Rule defines "senior agency official" as "an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues." *Id.* at 43,376.

182.   CEQ offers no explanation for the requirement that a senior agency official approve a departure. Vesting this authority with such a high-ranking official is likely to discourage employees working on the project from seeking such departures or even prevent the departures from being granted.

183.   CEQ claims these time and page limits are necessary to achieve "more timely reviews and reduce unnecessary paperwork." *Id.* at 43,309. CEQ concludes as much without assessing whether or how these limits would actually accomplish the touted objectives, citing only data regarding the average time and space that past environmental review documents have necessitated. *Id.*

184.   "[T]here can be many factors affecting the timelines and length of [environmental impact statements]. . . ." *Id.*

185.   Arbitrary time and page limits will lead to poorer analyses, less public disclosure, and reduced consideration of environmental effects. CEQ identifies no record or courts finding environmental impact statements inadequate because they were too long. However, the administrative record contains, and CEQ is aware of, numerous citations to cases in which agencies found environmental impact statements inadequate because those analyses were insufficiently comprehensive.

186.   Arbitrary time and page limits will incentivize rushed and inadequate analyses, disincentivize tailored outreach to stakeholders (including disproportionately harmed communities), and diminish opportunities for community input.

187.   Environmental review documents that do not satisfy NEPA's requirements will invite legal challenge. Environmental reviews that are rushed and insufficiently comprehensive to comply with NEPA will be found unlawful by courts. In these ways, arbitrary presumptive time and page limits will create inefficiency and foster delay.

188.   The 2020 Rule's stated goal for its presumptive time and page limits—more efficiency and less delay—is unsupported by CEQ's rationale. CEQ has offered no reasoned explanation for the time and page limits. CEQ identified no basis for its implicit conclusion that the presumptive time and page limits established by the 2020 Rule are appropriate in most, or even many, situations. Indeed, CEQ has identified no basis for the particular time and page limits it chose. CEQ did not describe any changed circumstances to explain why these new restrictions will result in more effective or efficient environmental review. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (agencies changing position must "show that there are good reasons for the new policy").

76

189.   CEQ "entirely failed to consider an important aspect of the problem" by ignoring the likelihood that the time and page limits will actually create additional inefficiency and delay. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## G.   CEQ's unlawful exclusion of extraterritorial projects

190.   A principle purpose of NEPA is to "prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. Consistent with that purpose, section 102(C) of NEPA requires each federal agency to prepare a "detailed statement" of the environmental impacts of any proposed major federal action significantly affecting the environment. *Id.* § 4332(2)(C). Section 102(F) requires that each federal agency "shall . . . recognize the worldwide and long-range character of environmental problems." *Id.* § 4332(2)(F).

191.   Courts have recognized that NEPA can apply to federal decisionmaking regarding federal actions that have exclusively extraterritorial environmental impacts. *See, e.g.*, *Envtl. Def. Fund, Inc. v. Massey*, 986 F. 2d 528, 529 (D.C. Cir. 1993).

192.   The 2020 Rule excludes from the definition of "major Federal action," and thus from the scope of NEPA's environmental review requirements, "agency activities or decisions with effects located entirely

outside of the jurisdiction of the United States." 85 Fed. Reg. at 43,375. This exclusion contravenes the plain language of NEPA and exceeds CEQ's statutory authority. *See* 5 U.S.C. § 706(2)(A), (C).

193.   CEQ rationalizes its decision to exclude from the definition of "major Federal action" any "agency activities or decisions with effects located entirely outside of the jurisdiction of the United States" based on CEQ's misinterpretation of certain federal judicial decisions, including *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), and *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). *See* 85 Fed. Reg. at 43,346-47. Because CEQ's interpretation of those decisions was erroneous, and also because those decisions do not address the meaning of NEPA or compel CEQ's interpretation of NEPA, CEQ's rationale for its extraterritoriality exclusion was arbitrary and capricious. 5 U.S.C. § 706(2)(A).

194.   CEQ's attempt to override prior judicial precedent holding NEPA applicable to decisions with extraterritorial effects exceeded CEQ's statutory authority, *see id.* § 706(2)(C).

## H.   CEQ's elimination of conflict-of-interest protections

195.   Section 102 of NEPA requires the preparation of "a detailed statement by the responsible official" for every "major Federal action[]

78

significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C).

196.   The 1978 regulations included conflict-of-interest protections

designed to maintain the integrity of the environmental review process. 43

Fed. Reg. at 56,001. Among other protections, the 1978 regulations

prohibited those with "financial or other interest in the outcome of the

project" from preparing an environmental impact statement. *Id.*

197.   CEQ previously found that "conflict[s] of interest" are inherent

where "those outside the government com[e] to the government for money,

leases or permits while attempting impartially to analyze the environmental

consequences." *Id.* at 55,987.

198.   CEQ determined that where a consulting firm has an interest

"in the decision on the proposal, it should be disqualified from preparing

the [environmental impact statement], to preserve the objectivity and

integrity of the NEPA process." 46 Fed. Reg. 18,031 (Mar. 23, 1981).

199.   The 2020 Rule reverses these long-standing CEQ conflict-of-

interest protections and allows a project applicant to prepare

environmental review documents, regardless of whether it has a financial

interest in the project. *See* 85 Fed. Reg. at 43,337, 43,371.

200. Judicial precedent demonstrates that a project proponent is less likely than a federal agency to disclose the full environmental impacts of their proposed project, or analyze the required range of alternatives, because their goal is to convince decisionmakers to approve the project.

201. Allowing project proponents to prepare environmental review documents impairs the quality of NEPA review and the efficiency of the NEPA process.

202. The 2020 Rule sets aside CEQ's prior conflict-of-interest protections without providing a reasoned basis to justify that departure.

203. CEQ offers no evidence to support its assertion that increased delegation of environmental impact statement preparation would improve "efficiency" or "communication," or improve "the quality of NEPA documents." *Id.* at 43,337. Nowhere does CEQ explain why or how abandoning its existing practice, and allowing project proponents to prepare review documents, will achieve these goals. Nor does CEQ provide any substantiation for its implicit premise that precluding financially conflicted parties from preparing environmental review documents created material communications problems or inefficiencies or compromise the quality of environmental review documents.

204.  The 2020 Rule will create more inefficiency, not less. This is because, under the 2020 Rule, NEPA documents will be prepared by the project proponent and then subsequently reviewed, analyzed, and confirmed by agency officials, *id.*, creating multiple levels of review—and additional inefficiencies—that did not previously exist. CEQ has failed to consider this important aspect of the problem.

205.  CEQ's rationale is insufficient to justify a major policy reversal. By allowing a project proponent to prepare NEPA environmental review documents, the 2020 Rule is inconsistent with the plain language of the statute, which requires "a detailed statement *by the responsible official.*" 42 U.S.C. § 4332(2)(C) (emphasis added). This aspect of the 2020 Rule also fails to meet the standards for reasoned agency decisionmaking required by section 10 of the APA. 5 U.S.C. § 706(2).

## I.    CEQ's failure to consider and adequately address public comments

206.  In promulgating the 2020 Rule, CEQ failed to meaningfully address or respond to numerous public comments submitted by Plaintiffs and others. *See* Exs. A-E (comment letters submitted by one or more Plaintiffs, incorporated herein by reference) (attachments omitted). The following paragraphs provide illustrative examples.

207.  Commenters explained that the Proposed Rule's elimination of the requirement to assess the cumulative impacts of a project will have disproportionate and adverse effects on environmental justice communities. As noted by commenters, conducting a cumulative effects analysis is necessary to consider the impacts of a project on environmental justice communities because such communities frequently have multiple pollution sources within their boundaries.

208.  CEQ provided a perfunctory response to these comments, summarily stating that the "changes do not disadvantage or adversely impact low-income and minority communities," and that "CEQ has reviewed the changes in this final rule and has determined that they would not result in adverse environmental impacts." CEQ, 2020 Rule, Final Rule Response to Comments 34 (June 30, 2020). CEQ also stated that the 2020 Rule will "improve coordination with local communities and expand opportunities for the public to participate," without explaining how the 2020 Rule will achieve those objectives. *Id.*

209.  CEQ does not address commenters' concerns that, under the Proposed Rule, agencies would not have to consider effects that are individually insignificant but significant when combined, to the detriment of environmental justice communities.

210.   CEQ responds to these concerns only by referring to its legal justification for the change. *See id.* at 467.

211.   Commenters also explained that eliminating the requirement to analyze indirect and cumulative impacts of a project would prevent agencies from assessing the significant impact of federal actions on climate change. The harms from climate change will disproportionately impact environmental justice communities.

212.   In response to comments that the impact of a proposed project on climate change will no longer be analyzed, CEQ responded only that the 2020 Rule "applies broadly to all types of proposed actions and effects on the environment. The precise way in which a given proposed action should be reviewed under the final rule will be based on the particular circumstances. The analysis would depend on whether the purported effects of the action are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, or are remote because of the length of the causal chain and the distance into the future at which effects would be manifested." *Id.* at 481.

213.   CEQ did not address specific comments about the impact of federal projects involving fossil fuels on climate change or the

disproportionate impacts climate change has on environmental justice communities.

214.   Commenters asserted that the Proposed Rule's revised definition of "major federal action" would disproportionately harm environmental justice communities by making fewer federal actions subject to NEPA review.

215.   CEQ acknowledged that the "changes would limit the ability of the public, especially environmental justice communities, to provide public comment on projects" but defended those limitations by stating that "to the extent the proposed changes would affect projects that are currently subject to categorical exclusions, no public comment would have been required under the 1978 regulations." *Id.* at 406. CEQ did not, however, address restrictions on the public's ability to comment on projects that would have required comment under the 1978 regulations, but will no longer require comment under the 2020 Rule.

216.   CEQ did not adequately respond to significant and relevant comments about how the Proposed Rule's definition of "major federal action" would disproportionately harm environmental justice communities.

217.   Commenters asserted that the Proposed Rule's repeal of CEQ's prior conflict-of-interest protections—and its reversal of CEQ's position

that such protections were necessary to maintain the integrity of NEPA environmental review—would lead to inefficiency and delay.

218.   CEQ acknowledged that "[c]ommenters stated the proposed change would lead to a less efficient NEPA process, requiring agencies to expend more of their limited time and resources reviewing applicant-authored materials, responding to public comments, and resolving administrative challenges to environmental reviews and NEPA procedures," but did not respond to those comments regarding decreased efficiency. *See id.* 389-90. In the preamble to the 2020 Rule, CEQ instead summarily repeated its justification that the change will "improve communication" and "efficiency," without explaining why it reached that conclusion, and without responding to commenters' concerns about the inefficiencies the revision will bring. 85 Fed. Reg. 43,337.

219.   The 2020 Rule narrows the circumstances under which a supplemental environmental impact statement is required. *See* 85 Fed. Reg. 43,328-29. Under the 2020 Rule, a supplemental environmental impact statement must be prepared only where "a major Federal action remains to occur" and where one of two other conditions is met. *Id.* at 43,328.

220.   Commenters asserted that CEQ's rationale for its relaxation of the supplementation requirement—that its revision is "consistent with Supreme Court case law," 85 Fed. Reg. 1700, 43,328—is not supported by judicial precedent. Commenters explained CEQ failed to consider that, at the time when the Supreme Court decided the case on which CEQ relies, agencies were required to consider the cumulative effects of a major federal action. CEQ did not respond to these comments.

221.   CEQ did not acknowledge commenters' objection to CEQ's rationale for the 2020 Rule's change to the supplementation requirement. Instead, CEQ simply recognized supporting comments, repeated its original rationale, and provided examples of when a supplemental statement is required under the 2020 Rule. *See* CEQ, 2020 Rule, Final Rule Response to Comments at 231-32; 85 Fed. Reg. 43,328-29.

222.   CEQ "fail[ed] to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).

223.   The 2020 Rule contends that it is "binding" upon other federal agencies. 85 Fed. Reg. at 43,358; *see also id.* at 43,373-74. CEQ lacks congressionally delegated authority to issue legislative rules under NEPA. However, the President has ordered all federal agencies to "comply with the

86

regulations issued by [CEQ] except where such compliance would be inconsistent with statutory requirements." Exec. Order No. 11,991, 42 Fed. Reg. at 26,968. Accordingly, while CEQ lacks statutory authority to issue legislative rules that warrant deference under the framework of *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984), its regulations have legal effects on other federal agencies to the extent of Presidential authority to command those agencies' implementation of NEPA. CEQ was accordingly required to comply with the notice-and-comment rulemaking procedures of 5 U.S.C. § 553 in promulgating the 2020 Rule. CEQ did not do so.

224.   In the alternative, if CEQ were held to have statutory authority to issue legislative rules that warrant deference under the framework of *Chevron*, 467 U.S. at 837, then CEQ was required to comply with the notice-and-comment rulemaking procedures of 5 U.S.C. § 553 in promulgating the 2020 Rule. CEQ did not do so.

## J.   CEQ's unauthorized and unlawful imposition of procedural restrictions on public participation and judicial review

225.   The 2020 Rule purports to require other federal agencies to adopt a number of procedural barriers to public participation, and restrictions on judicial review, that have no basis in NEPA and that CEQ is not authorized to impose. The 2020 Rule also purports to guide federal

courts' determination of their jurisdiction and the exercise of their equitable discretion.

226.   The 2020 Rule provides that public comments to federal agencies on NEPA documents must meet a number of prescriptive requirements, including that public comments "explain why the issues raised are important to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts," and "include or describe the data sources and methodologies supporting the proposed change." 85 Fed. Reg. at 43,368.

227.   The 2020 Rule provides: "Comments or objections of any kind not submitted, including those based on submitted alternatives, information, and analyses, shall be forfeited as unexhausted." 85 Fed. Reg. at 43,358.

228.   The 2020 Rule provides: "If the agency requests comments on the final environmental impact statement before the final decision, consistent with § 1503.1(b), comments and objections of any kind shall be raised within the comment period provided by the agency. Comments and objections of any kind not provided within the comment period(s) shall be considered unexhausted and forfeited, consistent with § 1500.3(b) of this chapter." 85 Fed. Reg. 43,368. CEQ appears to intend that if a member of

the public submits a comment on a draft environmental impact statement, but does not reiterate that exact same comment when the final environmental impact statement fails to address the commenter's concern, then the comment is "considered unexhausted and forfeited."

229.   The 2020 Rule provides: "It is the Council's intention that judicial review of agency compliance with the regulations in this subchapter not occur before an agency has issued the record of decision or taken other final agency action." 85 Fed. Reg. at 43,358.

230.   The 2020 Rule provides: "Harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements." 85 Fed. Reg. at 43,358.

231.   The 2020 Rule provides: "The regulations in this subchapter do not create a cause of action or right of action for violation of NEPA, which contains no such cause of action or right of action." 85 Fed. Reg. at 43,358.

232.   The 2020 Rule provides: "It is the Council's intention that the regulations in this subchapter create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm." 85 Fed. Reg. at 43,358.

233.   The 2020 Rule provides: "It is also the Council's intention that minor, non-substantive errors that have no effect on agency decision

making shall be considered harmless and shall not invalidate an agency action." 85 Fed. Reg. at 43,358.

234.   The 2020 Rule purports to require all federal agencies to follow, or impose, these procedures "unless there is a clear and fundamental conflict with the requirements of another statute." *See* 85 Fed. Reg. at 43,373.

235.   CEQ identifies no statutory source of authority to require other federal agencies to limit public participation, obstruct access to the courts, or purport to guide courts' determination of their own jurisdiction or exercise of their equitable discretion.

236.   Each of the provisions identified in the preceding 10 paragraphs is either governed by the APA, or another agency's organic statute, or common law. CEQ's erection of barriers to public participation and judicial review are inconsistent with judicial precedent and contrary to law.

237.   CEQ failed to consider important factors in adopting these restrictions on public participation. For example, many public commenters, including members of Plaintiffs, may have important information to provide, but lack the technical facility to meet CEQ's comment specificity requirements. Public commenters may be able to provide comment once, but may not have the resources to reiterate those comments if the agency

fails to include them in its summary of comments, or may comment on the

draft environmental impact statement, but lack the resources to repeat

their comments in response to the final environmental impact statement.

CEQ offers no justification for why it is appropriate or necessary to require

a public commenter, who has brought an issue to the agency's attention, to

repeat that comment again. The 2020 Rule is arbitrary and capricious

because CEQ failed to consider important aspects of the problem, and

provided no reasoned explanation for why raising barriers to public

participation will advance Congress's goals in enacting NEPA.

## K.   CEQ unlawfully premised its rulemaking on an assumption of congressionally delegated legislative authority

238.  When CEQ promulgated the 2020 Rule, it presumed, *see* 85

Fed. Reg. at 43,307, that its Rule was entitled to deference under the

framework of *Chevron*, 467 U.S. at 842-43. CEQ also specifically invoked,

*see* 85 Fed. Reg. at 43,307, the authority of *National Cable &*

*Telecommunications Association v. Brand X Internet Services*, 545 U.S.

967, 980-86 (2005), in which the Supreme Court stated that statutory

interpretations promulgated in agency regulations that are entitled to

*Chevron* deference may "trump" contrary "prior judicial construction[s]" of

a statute, unless those prior judicial constructions were based on the "the

unambiguous terms of the statute," *id.* at 982.

239.   An agency's statutory interpretation is entitled to *Chevron*
deference only "when it appears that Congress delegated authority to the
agency generally to make rules carrying the force of law, and that the
agency interpretation claiming deference was promulgated in the exercise
of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27
(2001).

240.   Subsequent to its decision in *Chevron*, the Supreme Court has
accorded CEQ regulations "substantial deference," at least when they had a
"well-considered basis." *Robertson*, 490 U.S. at 355-56. "Substantial
deference" is not the same as *Chevron* deference.

241.   In promulgating the 2020 Rule, CEQ cited no statutory
language that reflects a delegation of, or that CEQ specifically contends
delegates, legislative power from Congress to CEQ. In promulgating the
2020 Rule, CEQ cited no judicial precedent that holds that Congress
delegated legislative power to CEQ. CEQ has never, in any rulemaking prior
to its promulgation of the 2020 Rule, claimed entitlement to *Chevron*
deference.

242.   Congress did not delegate legislative rulemaking authority to
CEQ. CEQ has interpretive rulemaking authority. Its regulations bind other

federal agencies by virtue of an Executive Order, not a congressional delegation of legislative power.

243.   Because CEQ mistakenly assumed, in promulgating the 2020 Rule, that the Rule was entitled to *Chevron* deference, CEQ did not appropriately consider a critical factor that it was required to consider in promulgating an interpretive, non-legislative rule: the extent to which the 2020 Rule contravenes judicial interpretations of NEPA. The 2020 Rule, its preamble, and CEQ's associated response-to-comment document fail to address multiple cases decided by the federal courts that interpret NEPA in a manner inconsistent with the 2020 Rule. *See, e.g.*, Exs. A-E (comment letters submitted by one or more Plaintiffs, incorporated herein by reference, citing judicial precedent inconsistent with the 2020 Rule). CEQ's failure to address these cases was informed by CEQ's mistaken assumption of legislative rulemaking authority.

244.   In failing to address the extent to which the 2020 Rule contravenes judicial interpretations of NEPA, CEQ failed to consider a factor relevant to determining the limits of its interpretive authority, and relevant to interpreting NEPA. CEQ's failure renders the 2020 Rule arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A). CEQ's promulgation of a 2020 Rule that purports to interpret NEPA in a

manner that is inconsistent with judicial precedent exceeded CEQ's statutory authority. 5 U.S.C. § 706(2)(C).

### CLAIM FOR RELIEF

245.   Plaintiffs incorporate by reference all preceding paragraphs.

246.   In promulgating the 2020 Rule, CEQ violated the standards of reasoned agency decisionmaking required by section 10 of the APA. 5 U.S.C. § 706(2).

247.   CEQ did not provide "a rational connection between the facts found and the choice made," "entirely failed to consider [] important aspect[s] of the problem" and "offered [] explanation[s] for its decision that run[] counter to the evidence." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

248.   The 2020 Rule departs from CEQ's existing policy, without providing a "reasoned basis" or a "detailed justification" for ignoring its previous findings. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2217, 2126 (2016); *Fox Television Stations,* 556 U.S. at 515; *accord Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015).

249.   The 2020 Rule does not meet the procedural requirements imposed by the APA on the issuance of regulations with which an Executive Order commands other federal agencies to comply, or (in the alternative, if CEQ were held to have statutory authority to issue legislative rules) that

94

purport to carry the force of law, because CEQ failed "to respond to 'significant points' and consider 'all relevant factors' raised by the public comments." *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).

250.  The 2020 Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations or short of statutory right," and "without observance of procedure required by law," in violation of the standards of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2), and NEPA, 42 U.S.C. §§ 4331, 4332(2), 4344.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Declare that, under the standards of section 10 of the APA, the 2020 Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; exceeds CEQ's statutory authority; and was promulgated without observance of procedures required by law, *see* 5 U.S.C. §§ 553, 706(2); 42 U.S.C. §§ 4331, 4332(2), 4344.

B.    Vacate and set aside the 2020 Rule;

C.    Award Plaintiffs their costs of litigation, including reasonable attorney fees, to the extent permitted by law; and

D.    Grant other and further relief as the Court deems just and proper.

Respectfully submitted,

*s/ Nancy S. Marks*
Nancy S. Marks
Julia E. Jonas-Day (*pro hac vice forthcoming*)
Natural Resources Defense Council
40 West 20th Street, 11th Floor
New York, New York 10011
Tel: 212-727-2700

*Counsel for Environmental Justice Health Alliance, Texas Environmental Justice Advocacy Services, East Yard Communities for Environmental Justice, New Jersey Environmental Justice Alliance, Center for Community Action and Environmental Justice, National Audubon Society, and Natural Resources Defense Council*

*s/ Megan Sallomi*
Megan Sallomi
Lanessa L. Chaplin (*pro hac vice forthcoming*)
Stefanie D. Coyle
Molly K. Biklen
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
Tel: 212-607-3300

*Counsel for New York Civil Liberties Union*

<u>*s/ Bridget Lee*</u>
Bridget Lee
Sierra Club
9 Pine Street, Suite D
New York, New York 10005
Tel: 845-323-5493

*Counsel for Sierra Club*