**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ENVIRONMENTAL JUSTICE HEALTH ALLIANCE;
CENTER FOR COMMUNITY ACTION AND
ENVIRONMENTAL JUSTICE; EAST YARD COMMUNITIES
FOR ENVIRONMENTAL JUSTICE; NEW JERSEY
ENIRONMENTAL JUSTICE ALLIANCE; TEXAS
ENVIRONMENTAL JUSTICE ADVOCACY SERVICES;
NATURAL RESOURCES DEFENSE COUNCIL, INC.;
NATIONAL AUDUBON SOCIETY; NEW YORK CIVIL
LIBERTIES UNION; and SIERRA CLUB,

                Plaintiffs,

        v.

COUNCIL ON ENVIRONMENTAL QUALITY; and MARY B.
NEUMAYR, in her official capacity as Chairman of the Council
on Environmental Quality,

                Defendants,

No. 20 Civ. 6143 (CM)

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2689/2728
Fax: (212) 637-2702
danielle.levine@usdoj.gov
zachary.bannon@usdoj.gov

DANIELLE J. LEVINE
ZACHARY BANNON
Assistant United States Attorneys
– Of Counsel –

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

   I.  National Environmental Policy Act ................................................................................... 2

   II.  CEQ: The 1970s Guidelines and Regulations ................................................................. 3

   III. The 2020 Rule ................................................................................................................... 5

   IV. Plaintiffs' Alleged Harms and Litigation over the 2020 Rule ........................................ 9

ARGUMENT ................................................................................................................................ 11

   I.  Plaintiffs' Challenge to the 2020 Rule Is Unripe ........................................................... 11

      A.  Pre-Enforcement Facial Challenges to Regulations Are Presumptively Unripe ........ 12

      B.  The *Abbott Laboratories* Test Confirms that Plaintiffs' Lawsuit Is Not Ripe ........... 15

         1.  The Need for Factual Development Renders the Issues Unfit for Review .... 15

         2.  No Hardship Results from Waiting for a Concrete Dispute .......................... 17

   II.  In the Absence of a Live Dispute over a Concrete, Site-Specific Application of the 2020 Rule, Plaintiffs Lack Standing ........................................................................................ 20

      A.  *Summers* Forecloses Plaintiffs' Claim to Article III Standing .................................. 21

      B.  Each of Plaintiffs' Theories of Injury Suffer Additional Defects .............................. 25

         1.  Plaintiffs' Allegations of Substantive Harm Do Not Confer Standing .......... 25

         2.  Plaintiffs' Alleged Procedural Injuries Do Not Satisfy Article III ................ 29

         3.  Plaintiffs' Alleged Informational Injuries Do Not Satisfy Article III ........... 30

CONCLUSION ............................................................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967) ................................................................................................ 11, 15

*Advocate Health Care Network v. Stapleton,*
  137 S. Ct. 1652 (2017) ..................................................................................................... 7

*Allen v. Wright,*
  468 U.S. 737 (1984) ................................................................................................... 21, 24

*Andrus v. Sierra Club,*
  442 U.S. 347 (1979) .......................................................................................................... 3

*AT&T Corp. v. Iowa Utilities Bd.,*
  525 U.S. 366 (1999) ........................................................................................................ 18

*Atl. States Legal Found. v. Babbitt,*
  140 F. Supp. 2d 185 (N.D.N.Y. 2001) .......................................................................... 30

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003) ........................................................................................... 24

*Capital Legal Found. v. Commodity Credit Corp.,*
  711 F.2d 253 (D.C. Cir. 1983) ....................................................................................... 26

*Carroll v. Logan,*
  735 F.3d 147 (4th Cir. 2013) ...................................................................................... 7, 10

*CASA de Md., Inc. v. Trump,*
  971 F.3d 220 (4th Cir. 2020) ......................................................................................... 33

*Center for Food Safety v. Price,*
  No. 17 Civ. 3833 (VSB), 2018 WL 4356730 (S.D.N.Y. Sept. 8, 2018) .................... 32

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017) ........................................................................................... 31

*Chesapeake Climate Action Network v. Export-Import Bank of the United States,*
  78 F. Supp. 3d 208 (D.D.C. 2015) ........................................................................... 33, 34

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.,*
  123 F.3d 1142 (9th Cir. 1997) ............................................... 4

*City of Dallas, Tex. v. Hall*,
  562 F.3d 712 (5th Cir. 2009) ................................................ 4

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................... 27, 28, 33

*Cronin v. U.S. Dep't of Agriculture,*
  919 F.2d 439 (7th Cir. 1990) ................................................ 4

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) .......................................... 2, 3, 16, 23

*Federal Election Commission v. Akins,*
  524 U.S. 11 (1998) ......................................................... 30

*Florida Audubon Soc. v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) (en banc) .......................... 25, 27

*Food and Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................. 32

*Forsham v. Harris,*
  445 U.S. 169 (1980) ....................................................... 31

*Found. on Econ. Trends v. Lyng,*
  943 F.2d 79 (D.C. Cir. 1991) ............................................. 30

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) ........................................ 30, 31

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) ................................................... 11, 26

*Hunt v. Wash. State Apple Adver. Comm'n,*
  432 U.S. 333 (1977) ....................................................... 20

*Lance v. Coffman,*
  549 U.S. 437 (2007) ....................................................... 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .................................................. *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................................................................ *passim*

*Mayo v. Reynolds*,
  875 F.3d 11 (D.C. Cir. 2017) ................................................................................... 12

*McCrory v. Adm'r of the Fed. Emergency Mgm't Agency*,
  22 F. Supp. 3d 279 (S.D.N.Y. 2014), *aff'd* 600 F. App'x 807 (2d Cir. 2015) ......................... 26

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012) ..................................................................................... 20

*N.Y. Public Interest Research Group v. Whitman*,
  321 F.3d 316 (2d Cir. 2003) ..................................................................................... 24

*Nat. Res. Def. Council v. Bodine*,
  -- F. Supp. 3d --, No. 20 Civ. 3058 (CM), 2020 WL 3838017 (S.D.N.Y. July 8, 2020) .... *passim*

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ...................................................................................... 33

*National Park Hospitality Ass'n v. Dep't of the Interior*
  538 U.S. 803 (2003) ................................................................................................ *passim*

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) .................................................................................. 33

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ................................................................................ 33

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ................................................................................................ *passim*

*Public Citizen v. U.S. Department of Justice*,
  491 U.S. 440 (1989) ................................................................................................ 30, 31

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................................................ 1, 3

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974) ................................................................................................ 21, 26

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ................................................................................................ 31, 33

*Spokeo, Inc. v. Robins*,
　136 S. Ct. 1540 (2016)..................................................................................... 20, 21, 29, 34

*Stoncor Grp., Inc. v. Peerless Ins. Co.*,
　322 F. Supp. 3d 505 (S.D.N.Y. 2018).................................................................... 16

*Summers v. Earth Island Institute*,
　555 U.S. 488 (2009)........................................................................................... *passim*

*Taylor v. Bernanke*,
　No. 13 Civ. 1013, 2013 WL 4811222 (E.D.N.Y. Sept. 9, 2013)....................... 32, 33

*United States v. Quinones*,
　313 F.3d 49 (2d Cir. 2002)................................................................................. 15

*Utah Int'l Inc. v. Andrus*,
　488 F. Supp. 962 (D. Utah 1979)........................................................................ 4

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
　454 U.S. 464 (1982)............................................................................................ 11

*Vullo v. Office of Comptroller of the Currency*,
　No. 17 Civ. 3574 (NRB), 2017 WL 6512245 (S.D.N.Y. Dec. 12, 2017)............... 15

*Whitmore v. Arkansas*,
　495 U.S. 149 (1990)............................................................................................ 24

*Wilderness Soc'y, Inc. v. Rey*,
　622 F.3d 1251 (9th Cir. 2010) ........................................................................... 29, 30

*Williams v. Taylor*,
　529 U.S. 362 (2000)............................................................................................ 7

*Ziemba v. Rell*,
　409 F.3d 553 (2d Cir. 2005)................................................................................ 27

**Statutes**

42 U.S.C. § 4332................................................................................................. 2, 7, 30, 31

**Regulations**

23 C.F.R. Part 771 (2019)................................................................................... 3

33 C.F.R. Part 230 (2019)................................................................................... 3

36 C.F.R. Part 220 (2019) .................................................................................................. 3

40 C.F.R. § 1500 (2020) ..................................................................................................... 1

40 C.F.R. § 1500.1(b) (2020) ............................................................................................ 18

40 C.F.R. § 1500.3(c) (2020) ............................................................................................. 9

40 C.F.R. § 1501.1(b) (2020) ............................................................................................. 1

40 C.F.R. § 1502.10 (2020) ............................................................................................... 2

40 C.F.R. § 1502.15 (2020) ............................................................................................... 6

40 C.F.R. § 1502.7 (2019) ............................................................................................. 4, 8

40 C.F.R. § 1503.3(b) (2020) ............................................................................................. 8

40 C.F.R. § 1506.5(b)(4) (2020) ........................................................................................ 8

40 C.F.R. § 1506.5(c) (2019) ............................................................................................. 8

40 C.F.R. § 1507.3 (2019) ................................................................................................. 3

40 C.F.R. § 1508.1(g) (2020) ........................................................................................ 6, 16

40 C.F.R. § 1508.1(q) (2020) ............................................................................................. 8

40 C.F.R. § 1508.18 (2019) ............................................................................................... 7

40 C.F.R. § 1508.8(a) (2019) ............................................................................................. 6

## Other Authorities

43 Fed. Reg. 55,978 (Nov. 29, 1978) ................................................................................ 3

44 Fed. Reg. 873 (Jan. 3, 1979) ........................................................................................ 3

83 Fed. Reg. 28,591 (June 20, 2018) ................................................................................ 5

85 Fed. Reg. 1,684 (Jan. 10, 2020) ................................................................................... 5

85 Fed. Reg. 43,304 (July 16, 2020) ...................................................................... *passim*

## PRELIMINARY STATEMENT

Plaintiffs ask this Court to conduct a facial, pre-enforcement review of the Council on Environmental Quality's ("CEQ") revised procedural regulations governing implementation of the National Environmental Policy Act ("NEPA"). *See* 85 Fed. Reg. 43,304 (July 16, 2020). But CEQ's rule (the "2020 Rule") does not—without further federal agency actions—impact the regulated community or public. The 2020 Rule simply establishes *internal* government procedures that other federal agencies will follow when revising their own agency-specific procedures, or when proposing and analyzing future agency actions under NEPA. 85 Fed. Reg. at 43,376; 40 C.F.R. § 1500-1508.1 (2020).

NEPA is a procedural statute; it does not dictate substantive outcomes. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). It is instead "intended to ensure Federal agencies consider the environmental impacts of their action." 85 Fed. Reg. at 43,316. *See, e.g.*, 40 C.F.R. § 1501.1(b) (providing that agencies may determine whether actions or decisions are "major Federal actions" on a case-by-case basis or through the promulgation of agency-specific NEPA procedures, as appropriate). Plaintiffs do not allege that new procedures or standards have yet been applied to any specific federal project. And, as discussed below, the Administrative Procedure Act ("APA") does not permit challenges to regulations in the abstract. Rather, a plaintiff must "direct its attack against some particular 'agency action' that 'causes it harm." *Lujan v. Nat'l Wildlife Fed'n* ("*NFW*"), 497 U.S. 871, 891 (1990).

Here, Plaintiffs speculate that the 2020 Rule *may* cause federal agencies to make decisions in a manner that *may* harm them. But Plaintiffs cannot speculate about what might happen, and thereby try to shift the burden to CEQ to prove that Plaintiffs cannot conceivably be injured. It its Plaintiffs' burden to establish jurisdiction by injury *now*. Their alleged harms are insufficient to justify wholesale facial APA review of the 2020 Rule. Congress chose not to permit facial, pre-

enforcement review of NEPA regulations in the statute. If and when the 2020 Rule is applied to an action in a manner that actually harms a plaintiff, that plaintiff can challenge those aspects of the 2020 Rule that cause them harm. Absent a concrete project in which those theoretical harms come to be, these Plaintiffs' allegations are speculative. Their challenge is accordingly barred by the related justiciability doctrines of ripeness and standing. The Complaint should be dismissed.

## BACKGROUND

### I.    National Environmental Policy Act

Signed into law in 1970, NEPA "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). The NEPA process has come to be defined by NEPA's requirement that a "responsible official" within an agency prepare a "detailed statement"—an environmental impact statement, or EIS—"on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must include information regarding (i) "the environmental impact of the proposed action"; (ii) "any adverse environmental effects which cannot be avoided should the proposal be implemented"; (iii) "alternatives to the proposed action"; (iv) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (v) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.*; *see also* 40 C.F.R. § 1502.10 (2020); 40 C.F.R. § 1502.10 (2019).[1]

---

[1] This brief uses the year "2020" to designate CEQ's new regulations and "2019" to designate its precursors.

## II.      CEQ: The 1970s Guidelines and Regulations

NEPA also established CEQ, an agency within the Executive Office of the President "with authority to issue regulations interpreting" NEPA. *Pub. Citizen*, 541 U.S. at 757. For its first few years, CEQ issued only guidelines to federal agencies on NEPA compliance. *See* 43 Fed. Reg. 55,978, 55,978 (Nov. 29, 1978). However, agencies took varied views on whether the guidelines bound them. Courts accorded the guidelines differing weights, resulting in inconsistent agency practices and judicial interpretations of NEPA. *Id.* Accordingly, in 1978, CEQ "promulgated regulations to guide federal agencies in determining what actions are subject to [NEPA's] statutory requirement." *Pub. Citizen*, 541 U.S. at 757; *see also* 43 Fed. Reg. at 55,978; 44 Fed. Reg. 873 (Jan. 3, 1979) (technical corrections); 40 C.F.R. §§ 1500-1508 (2019) (CEQ regulations).[2] The Supreme Court has determined that CEQ's interpretation of NEPA through its regulations is entitled to "substantial deference." *Methow Valley Citizens Council*, 490 U.S. at 355 (citing *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979)).

In promulgating the 1978 regulations, CEQ's stated goal was "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment." 43 Fed. Reg. at 55,978. Under the regulations, however, implementation of NEPA has been complex, resulting in conflicting judicial decisions and leading NEPA to become the most litigated environmental statute in the United States. *See* James E. Salzman and Barton H. Thompson, Jr., ENVIRONMENTAL LAW AND POLICY

---

[2] CEQ's 1978 regulations further directed that each agency adopt its own regulations to supplement the CEQ's, as necessary. *See* 40 C.F.R. § 1507.3 (2019). Over eighty-five federal agencies and their subunits have developed such procedures. *See, e.g.*, 23 C.F.R. Part 771 (2019) (Federal Highway Administration/Federal Transit Administration); 33 C.F.R. Part 230 (2019) (U.S. Army Corps of Engineers—Civil Works); 36 C.F.R. Part 220 (2019) (U.S. Forest Service).

340 (5th ed. 2019) ("Perhaps surprisingly, there have been thousands of NEPA suits. It might seem strange that NEPA's seemingly innocuous requirement of preparing an EIS has led to more lawsuits than any other environmental statute."). To contend with these complexities and try to reduce litigation risk, agencies began promulgating voluminous environmental studies. This effort often proved futile, as nothing required the public to thoroughly comment or exhaust their issues with the agency before litigation. CEQ has found that the average length of EISs prepared by Federal agencies has increased to over 600 pages, far exceeding the scope anticipated by the 1978 regulations, and exceeding "the point where useful information is being produced and utilized by decision makers." 85 Fed Reg. at 43,305. *Compare* Council on Environmental Quality, Length of Environmental Impact Statements (2013-2018), at 1 (June 12, 2020) ("CEQ Length of EISs Report"), *available at* https://ceq.doe.gov/nepa-practice/eis-length.html (last visited Oct. 15, 2020) (noting that the average EIS was 661 pages in length between 2013 and 2018), *with* 40 C.F.R. § 1502.7 (2019) (an EIS "shall normally be less than 150 pages").

The complexity of the NEPA process has resulted in paralysis for many federal projects. *See, e.g.*, *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990) (noting that "a full-fledged environmental impact statement . . . is very costly and time-consuming to prepare and has been the kiss of death to many a federal project"); *City of Dallas, Tex. v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (same); *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1176 (9th Cir. 1997) (Trott, J., concurring in part and dissenting in part) ("[T]oo much of anything can be trouble, and one can only wonder if this case and the tortured history of this traffic amelioration proposal suggest that too much process now renders any controversial project too difficult and costly to accomplish, regardless of its merit."); *Utah Int'l Inc. v. Andrus*, 488 F. Supp. 962, 973 (D. Utah 1979) ("[T]he enactment of NEPA in 1969 has materially aided the

transformation of federal coal leasing into a complicated and cumbersome process. Substantial delays pending preparation of EISs and the implementation of new regulations appear to be inherent in such a labyrinthine process."). While CEQ advised shortly after promulgation of its regulations in 1978 that the time to complete the EIS process should not exceed one year even for the most complex energy projects, the average time for completion of an EIS and issuance of a decision has increased to four-and-a-half years. *See* Council on Environmental Quality, Environmental Impact Statement Timelines (2010-2017) at 1 (December 14, 2018), *available at* https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timelines_Report_2018-12-14.pdf (last visited Nov. 16, 2020).

### III.   The 2020 Rule

CEQ recently set out to modernize its 1978 regulations and improve implementation of NEPA. It issued an advanced notice of proposed rulemaking in June 2018, requesting comment on potential updates and clarifications to its regulations. 83 Fed. Reg. 28,591 (June 20, 2018). Using information derived from its advanced notice, CEQ published a notice of proposed rulemaking in January 2020 and provided an opportunity for public comment on its draft rule. 85 Fed. Reg. 1,684 (Jan. 10, 2020). In response, CEQ received 1,145,571 comments. 85 Fed. Reg. at 43,306. CEQ considered all substantive issues raised in those comments, made revisions to its proposal, and published its final rule on July 16, 2020.

The 2020 Rule pursues the same laudable goal as those promulgated in 1978: "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment." 85 Fed. Reg. at 43,313. Its changes were designed "to align the regulations with the text of the NEPA statute," to ensure that NEPA documents are concise and inform decisionmakers and the public regarding the environmental effects of specified federal actions, and "to ensure that the regulations reflect

changes in technology, increase public participation in the process, and facilitate the use of existing studies, analyses, and environmental documents . . . ." *Id.*

The 2020 Rule made a number of revisions to CEQ's regulations, some of which are challenged in this lawsuit. For example, the 1978 regulations required agencies to consider the "direct effects,"[3] "indirect effects,"[4] and "cumulative impact"[5] of a proposed action. The 2020 Rule revised the definition of "effects or impacts" to reflect the text of the statute, and to provide for a more straightforward definition, consistent with relevant Supreme Court case law:

> Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

40 C.F.R. § 1508.1(g) (2020). The 2020 Rule further amended 40 C.F.R. § 1502.15 to explain that an EIS should succinctly describe the baseline "affected environment" of a project, "including the reasonably foreseeable environmental trends and planned actions in the area(s)." CEQ explained that "[t]his change responds to comments raising concerns that eliminating the definition of cumulative impact would result in less consideration of changes in the environment." 85 Fed. Reg. at 43,331 (internal citations omitted). In response to concerns raised about whether the 2020 Rule required consideration of climate change, CEQ explained that the 2020 Rule "does not preclude consideration of the impacts of a proposed action on any particular aspect of the human

---

[3] Defined as effects "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a) (2019).

[4] Defined as those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b) (2019).

[5] Defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7 (2019).

environment, [and the] analysis of the impacts on climate change will depend on the specific circumstances of the proposed action." 85 Fed. Reg. at 43,344. In some instances, "[t]rends determined to be a consequence of climate change would be characterized in the baseline analysis of the affected environment rather than as an effect of the action." *Id.* Or, if a climate impact has a reasonably foreseeable and reasonably close causal relationship to a particular project, then it could be addressed as an environmental effect. "Similar to the 1978 regulations, these regulations do not concern any particular environmental media, nor are the regulations tied to a specific environmental setting." 85 Fed. Reg. at 43,353.

Another revision challenged by Plaintiffs involves interpretation of the term "major Federal action." This appears in the provision requiring EISs for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The 1978 regulations stated "[m]ajor reinforces but does not have a meaning independent of significantly," effectively rendering the word "major" meaningless. 85 Fed. Reg. at 43,345; 40 C.F.R. § 1508.18 (2019). To clarify that "major" has meaning—as all words in a statute should[6]—the 2020 Rule defines "major Federal action" as "an activity or decision subject to Federal control and responsibility," and removes the statement that "[m]ajor reinforces but does not have a meaning independent of significantly." 85 Fed. Reg. at 43,345; *id.* at 43,375 (40 C.F.R. §1508.1(q) (2020)). Thus, under the 2020 Rule, "major" refers to "the type of action," including whether the action is sufficiently federal, final, and discretionary to trigger NEPA, and "significance" refers to the extent of the environmental impacts of the action. *Id.* at 43,345. Following well-established case law, the 2020

---

[6] *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("Our practice, however, is to 'give effect, if possible, to every clause and word of a statute.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000))); *Carroll v. Logan*, 735 F.3d 147, 152 (4th Cir. 2013) ("[C]ourts should give effect to every word of a statute whenever possible.").

Rule also lists activities or decisions that do not demonstrate the requisite Federal control and responsibility to qualify as major federal actions, including "[e]xtraterritorial activities," "[n]on-Federal projects with minimal federal funding or minimal Federal involvement," or "[l]oans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance," 40 C.F.R. § 1508.1(q)(1). CEQ "expects that agencies will further define these non-major actions, for which the agency does not exercise sufficient control and responsibility over the outcome of the project, in their agency NEPA procedures pursuant to § 1507.3(d)(4)." 85 Fed. Reg. at 43,347.

Plaintiffs also challenge several technical aspects of the 2020 Rule revisions. For example, the 1978 regulations provided that "[t]he text of final environmental impact statements shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages." 40 C.F.R. § 1502.7 (2019). The 2020 Rule revised this provision to mandate the same page limits imposed by the 1978 regulations "unless a senior agency official of the lead agency approves in writing a statement to exceed 300 pages." 40 C.F.R. § 1502.7 (2020). And where the 1978 regulations allowed applicants and contractors to assist in the preparation of environmental assessments subject to agency oversight, they allowed contractors to assist with preparation of EISs only if they "specif[ied] that they have no financial or other interest in the outcome of the project." 40 C.F.R. § 1506.5(c) (2019). To improve information and communications, the 2020 Rule expands this practice to allow contractors or applicants to assist in the preparation of EISs, subject to lead agency oversight, independent verification, revisions where appropriate, and agency assumption of responsibility for the accuracy, scope and contents of the documentation. 40 C.F.R. § 1506.5(b)(4) (2020). Plaintiffs also take issue with the 2020 Rule's revisions relating to public commenting on EISs, which provide that comments should be

timely submitted, *see* 40 C.F.R. § 1503.3(b) (2020), and that commenters should "explain why the issues raised are important" and "where possible . . . include or describe the data sources and methodologies supporting the proposed changes," *id.* § 1503.3(a). And finally, Plaintiffs challenge a number of provisions stating the CEQ's intentions relating to judicial review under NEPA. *See, e.g.*, 40 C.F.R. § 1500.3(c) ("It is the Council's intention that judicial review of agency compliance with the regulations in this subchapter not occur before an agency has issued the record of decision or taken other final agency action."); *id.* § 1500.3(d) ("It is the Council's intention that the regulations in this subchapter create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm.").

Plaintiffs' remaining challenges target the 2020 Rule's overall compliance with certain executive orders, *see* Compl. ¶¶ 169-78, CEQ's alleged failure to address public comments, *see id.* ¶¶ 206-24, and the deference and force of law commanded by the 2020 Rule, *see id.* ¶¶ 238-44, rather than challenging specific aspects of the 2020 Rule itself.[7]

## IV.   Plaintiffs' Alleged Harms and Litigation over the 2020 Rule

In an effort to establish standing, Plaintiffs allege a number of harms. They attribute these harms to the 2020 Rule, both on their own behalf and on behalf of their members. Plaintiffs' alleged harms can be grouped into three broad categories: substantive harm, procedural harm, and informational harm. First, Plaintiffs allege that the 2020 Rule will cause them substantive harm, *i.e.*, harms to their environmental, religious, aesthetic, scientific, or recreational interests. Plaintiffs speculate that pending or future projects *may* fail to account for certain impacts, *potentially* causing federal agencies to make decisions that are *possibly* less protective of the environment, thereby

---

[7] Because this is a motion to dismiss for lack of standing or ripeness, CEQ sets forth the foregoing explanations for the changes it adopted in the 2020 Rule only for purposes of illustration.

*potentially* causing environmental or other harms to Plaintiffs' interests. *See, e.g.*, Compl. ¶¶ 29-35, 41-42, 51-53. 59-62, 65-66, 77-79, 80-82, 94-100, 106-08. Second, Plaintiffs allege the 2020 Rule causes them procedural injury. Plaintiffs assert a constraint on their ability to comment on pending and future projects during the NEPA process, and to succeed in judicial challenges to NEPA reviews. *See, e.g.*, Compl. ¶¶ 63, 73, 89, 103-04, 110. Third, Plaintiffs allege informational harm. They claim that the 2020 Rule may deprive them of information permitting them to fully understand the health and environmental impacts of other agencies' proposed actions—preventing them from educating their members and causing them to divert resources to fill the informational gap left by these later agency actions. *See, e.g.*, Compl. ¶¶ 23-24, 36, 44, 47-48, 53-56, 68, 69, 70-72, 90-91, 101-02, 111. None of these alleged harms is sufficient to establish standing or a ripe case.

At bottom, the Complaint alleges that the 2020 Rule *could* cause *some* federal agency to apply the 2020 Rule to a *future* NEPA review in a way that *could* harm Plaintiffs. But the Complaint does not tie its allegations to any concrete application of the 2020 Rule. Nonetheless, the Complaint asks the Court to facially vacate and set aside the 2020 Rule in its entirety and reinstate the 1978 regulations. *Id.* Prayer for Relief ¶¶ A, B.

\* \* \*

Plaintiffs' Complaint is similar to lawsuits filed in three other judicial districts challenging the 2020 Rule. *See Wild Va. v. CEQ*, No. 3:20-cv-00045 (W.D. Va. filed July 29, 2020); *Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-5199 (N.D. Cal. filed July 29, 2020); *California v. CEQ*, No. 3:20-cv-06057 (N.D. Cal. Filed Aug. 28, 2020); *Iowa Citizens for Cmty. Improvement v. CEQ*, No. 20-cv-2715 (D.D.C. filed Sep. 23, 2020). In one case, *Wild Virginia v. CEQ*, motion practice has occurred. There, plaintiffs—making similar arguments that Plaintiffs press here—

sought a preliminary injunction barring implementation of the 2020 Rule. Mot. for Prelim. Inj., *Wild Va. v. CEQ*, No. 3:20-cv-00045 (W.D. Va. Aug. 18, 2020) (ECF No. 30). The court denied that motion, finding plaintiffs failed to show that they are likely to succeed on the merits of their challenge to the 2020 Rule. Op. & Order at 11, *Wild Va. v. CEQ*, No. 3:20-cv-00045 (W.D. Va. Sept. 11, 2020) (ECF No. 92). The court subsequently denied—without comment or analysis— CEQ's motion to dismiss and set a schedule for resolution of the case on cross-motions for summary judgment. Order, *Wild Va. v. CEQ*, No. 3:20-cv-00045 (W.D. Va. Sept. 21, 2020) (ECF No. 98).

## ARGUMENT

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). The purpose of this requirement is to ensure that legal issues "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Plaintiffs' pre-enforcement, facial challenge to the 2020 Rule is not justiciable. Two related justiciability doctrines—ripeness and standing—bar Plaintiffs from challenging the 2020 Rule until it has been applied in a decision causing them actual, concrete "real world" harm.

### I.      Plaintiffs' Challenge to the 2020 Rule Is Unripe

"[I]njunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967). The "basic rationale" of the ripeness doctrine is "to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies

from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148-49. The type of challenge mounted by Plaintiffs—a pre-enforcement facial challenge to a regulation—is ordinarily unripe. Because an attenuated chain of events must occur, including an independent decision by a separate federal agency, before CEQ's 2020 Rule is applied in the manner that could harm Plaintiffs, there is no basis to depart from this default rule. Plaintiffs must wait until the 2020 Rule is applied by an agency to a site-specific project in a manner that harms them before they mount a legal challenge. A particular provision of the 2020 Rule that purportedly injures them can then be challenged in that context.

### A. Pre-Enforcement Facial Challenges to Regulations Are Presumptively Unripe

In the absence of a special statutory provision expressly allowing for pre-enforcement review, "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *NWF*, 497 U.S. at 891.[8] A trio of Supreme Court cases—*Reno v. Catholic Social Services, Inc.*, *National Park Hospitality Ass'n v. Department of the Interior*, and *Ohio Forestry Association v. Sierra Club*—show how this principle applies to agency actions that, like the 2020 Rule, set only procedures for

---

[8] "Some statutes permit broad regulations . . . to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt." *NWF*, 497 U.S. at 891. NEPA contains no such provision. *See, e.g.*, *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017) ("NEPA does not provide a private right of action.").

future agency action. These decisions establish that facial, pre-enforcement challenges to such actions are not ripe.

In *Reno v. Catholic Social Services, Inc.* ("*CSSI*"), the Supreme Court considered a facial challenge to two regulations issued to administer the alien legalization program created by Title II of the Immigration Reform and Control Act of 1986. 509 U.S. 43, 45 (1993). Those regulations interpreted two statutory conditions that would be applied on a case-by-case basis to determine whether an individual was entitled to temporary resident status. *Id.* at 46-50. The Supreme Court held that the plaintiff's "claim would ripen only once he took the affirmative steps that he could take before the [agency] blocked his path by applying the regulation to him." *Id.* at 59. The plaintiff's facial challenge was unripe because the regulations "impose[d] no penalties for violating any newly imposed restriction." *Id*. at 58.

Five years later, a plaintiff challenged the National Forest Service's issuance of a forest plan that "set[] logging goals, select[ed] the areas of the forest that [we]re suited to timber production, and determine[d] which 'probable methods of timber harvest' [we]re appropriate." *Ohio Forestry Ass'n v. Sierra Club* ("*OFA*"), 523 U.S. 726, 729 (1998) (citations omitted). But the plan "did not itself authorize the cutting of any trees"—a determination that required a logger to undergo a further permitting process. *Id.* The Supreme Court determined that the plaintiff's facial challenge was unripe. *Id.* at 732-37. It noted that, at the pre-enforcement stage, "review would have to take place without benefit of the focus that a particular logging proposal could provide," requiring the Court to "predict[] consequences that may affect different parcels of land in a variety of ways." *Id.* at 736. It concluded that "further factual development would significantly advance [its] ability to deal with the legal issues presented and would aid [them] in their resolution," *id.* at 737 (quotation marks omitted), and held that the claim was not ripe.

Finally, in *National Park Hospitality Association v. Department of the Interior* ("*NPHA*"), the Supreme Court heard a facial challenge to a National Park Service regulation that rendered the Contract Disputes Act of 1978 inapplicable to concession contracts. 538 U.S. 803, 804-05 (2003). The Supreme Court declined to rule on the merits, finding that the challenge was unfit for review because it would not be clear to what "types of concession contracts" the regulation might apply, *id.* at 812, until it was applied to a particular dispute. Because the regulation did not affect the petitioner's "primary conduct," no harm resulted from waiting for a dispute to arise. *Id.* at 810.

Read together, *CSSI*, *OFA*, and *NPHA* establish that, where a regulation only guides future agency actions—and does not regulate the conduct of, or pose an immediate threat to, plaintiffs or their members—challengers cannot bring a facial, pre-enforcement challenge to that regulation and must instead wait for it to be applied to an agency action in a manner that harms them. Plaintiffs' challenge to the 2020 Rule falls squarely within this rule. For example, Plaintiffs challenge the 2020 Rule's revisions to the definition of "major Federal action." Compl. ¶¶ 156-68; 190-94. But these revisions may be still be refined by agencies' NEPA procedures, subject to those agencies' discretion. *See* 85 Fed. Reg. at 43,347 ("CEQ expects that agencies will further define these non-major actions, for which the agency does not exercise sufficient control and responsibility over the outcome of the project."). And, agencies must still determine, in further exercise of their discretion, whether specific projects satisfy these new requirements.

It is only after the 2020 Rule has been implemented through agency approval of a specific action that Plaintiffs' speculative aesthetic, religious, scientific, and recreational harms could come to fruition. In other words, a "considerable legal distance," *OFA*, 523 U.S. at 730, separates the 2020 Rule from the harms Plaintiffs allege. As in *NWF*, *CCSI*, *OFA*, and *NPHA*, Plaintiffs' challenge to the 2020 Rule will not be ripe "until the scope of the controversy has been reduced to

14

more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the [their] situation in a fashion that harms or threatens to harm [them]." *NWF*, 497 U.S. at 891.

**B.     The *Abbott Laboratories* Test Confirms that Plaintiffs' Lawsuit Is Not Ripe**

The same result can be derived from ripeness first principles. In the Supreme Court's seminal ripeness case, it explained that courts must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration" when determining whether a case is ripe. *Abbott Laboratories*, 387 U.S. at 149. Both *Abbott Laboratories* factors strongly support the conclusion that Plaintiffs' facial pre-enforcement challenge to the 2020 Rule is not ripe.

**1.     The Need for Factual Development Renders the Issues Unfit for Review**

While the Second Circuit has suggested that challenges that present "purely legal question[s]" are "eminently fit for judicial review," *see United States v. Quinones*, 313 F.3d 49, 59 (2d Cir. 2002) (quotation marks omitted), courts have since clarified that whether a challenge presents a purely legal question "is not dispositive," *Vullo v. Office of Comptroller of the Currency*, No. 17 Civ. 3574 (NRB), 2017 WL 6512245, at *9 (S.D.N.Y. Dec. 12, 2017). Instead, courts ask whether "further factual development would significantly advance [the court's] ability to deal with the legal issues presented." *NPHA*, 538 U.S. at 812 (quotation marks omitted). Here, "future contingencies that remain may be determinative of the questions" presented by Plaintiffs, rendering their suit unfit for review. *Vullo*, 2017 WL 6512245, at *9 (quotation marks omitted).

Plaintiff NYCLU's allegations regarding exclusion of projects with "minimal Federal funding or minimal Federal involvement" from the definition of "major Federal action," *see* Compl. ¶¶ 158-61, highlight this point. NYCLU asserts that, under this new definition, "there is a significant risk that the Route 33 project will be exempt from NEPA review." *Id.* ¶ 69. But the

15

Complaint contains no allegations about what federal agency is involved in the Route 33 project, nor the nature of its involvement. Whatever agency may be involved, Plaintiffs have not alleged application of the 2020 Rule by such agency to the Route 33 Project or any resulting harms to Plaintiffs. Plaintiffs contend that there is "no evidence to support the premise that an agency that is providing some level of federal funding or is otherwise involved in a project could not influence the project's outcome." Compl. ¶ 161. But further factual development regarding the scope of federal involvement in the Route 33 project and the manner in which the agency interprets and applies the phrase "minimal Federal involvement" is plainly necessary to the resolution of Plaintiffs' claims. *See generally Public Citizen*, 541 U.S. at 767 ("[A] 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations.").

Plaintiffs' challenges to the 2020 Rule's definition of "effects" provides another example. For instance, one Texas Environmental Justice Advocacy Services member is concerned that NEPA review in future projects will "fail[] to account for the indirect impacts of increased traffic in the Houston Ship Channel." Compl. ¶ 32. But with no specific application of the updated regulations to a particular project at issue, it is not clear why the 2020 Rule's requirement that an agency take into account effects that are "reasonably foreseeable and have a reasonably close causal relationship to the proposed action" would not capture her concerns about ship traffic. 40 C.F.R. § 1508.1(g) (2020). Plaintiffs argue that CEQ has failed to explain why its rule "will not cause agencies to overlook significant impacts of a project." Compl. ¶ 150. This tries to shift the burden of proof. It is Plaintiffs' burden to establish the ripeness of their claims. *See Stoncor Grp., Inc. v. Peerless Ins. Co.*, 322 F. Supp. 3d 505, 511 (S.D.N.Y. 2018). Until (and if) an agency implements and applies the 2020 Rule in a manner that does not take into account ship traffic in

the Port of Houston and in a manner causing harm to Plaintiffs' interests, this Court will not have the facts necessary to evaluate Plaintiffs' challenge to the 2020 Rule's definition of effects.

The Supreme Court has warned that a case is not fit for judicial review where review "could hinder agency efforts to refine its policies" through revision and application of a policy or regulation in practice. *OFA*, 523 U.S. at 735; *see also NPHA*, 538 U.S. at 812 (declining to review regulation until it was applied to a specific contract, to determine the manner in which the agency would apply the regulation in practice). But Plaintiffs' challenge seeks review before agencies have implemented the 2020 Rule and applied it to a particular action in a manner that harms them. The Supreme Court has further warned that—rather than speculate on the application of a "technically based plan . . . that may affect many different parcels of land in a variety of ways"— courts should wait until they get the "benefit of the focus that a particular . . . proposal could provide." *OFA*, 523 U.S. at 736. Again, Plaintiffs ask the Court to issue a blanket ruling on the manner in which different agencies may consider varied effects—on rail traffic, flooding, emissions, and public transportation, to name a few—from still-unknown projects without the benefit of specific projects in which those issues present themselves. "This type of review threatens the kind of abstract disagreements over administrative policies that the ripeness doctrine seeks to avoid." *Id.* (quotation marks omitted).

Because further factual development will shape the issues before the Court, the first *Abbott Laboratories* factor—fitness for judicial review—demonstrates that Plaintiffs' pre-enforcement facial challenge is unripe.

### 2.    No Hardship Results from Waiting for a Concrete Dispute

The second *Abbott Laboratories* factor—hardship to the parties—leads to the same result. To determine whether a party will face hardship as the result of an action, courts look to whether

the action "create[s] adverse effects of a strictly legal kind," *OFA*, 523 U.S. at 733, and whether

the action "affect[s] . . . primary conduct." *NPHA*, 538 U.S. at 810. The 2020 Rule does neither.

The Supreme Court described "adverse effects of a strictly legal kind" as "effects of a sort

that traditionally would have qualified as harm." *OFA*, 523 U.S. at 733. Agency actions do not

create adverse effects of this sort when:

> [T]hey do not command anyone to do anything or to refrain from doing anything;
> they do not grant, withhold, or modify any formal legal license, power, or authority;
> they do not subject anyone to any civil or criminal liability; [or] they create no legal
> rights or obligations.

*Id.* The 2020 Rule falls squarely within this description. Its effect is to guide agencies on how to

apply NEPA to new federal actions. *See* 40 C.F.R. § 1500.1(b). The 2020 Rule can affect Plaintiffs

only if and when an agency applies it to future site-specific actions that affect Plaintiffs' interests.

Plaintiffs may not protect those alleged interests through a facial pre-enforcement challenge. They

"will have ample opportunity later to bring [their] legal challenge at a time when harm is more

imminent and more certain"; there is no "strong reason why [Plaintiffs] must bring [their]

challenge now in order to get relief." *OFA*, 523 U.S. at 734.[9]

The 2020 Rule also does not affect Plaintiffs' primary rights. "When . . . there is no

immediate effect on the plaintiff's primary conduct, federal courts normally do not entertain pre-

enforcement challenges to agency rules and policy statements." *AT&T Corp. v. Iowa Utilities Bd.*,

525 U.S. 366, 386 (1999). Some agency regulations "force [plaintiffs] to modify [their] behavior

in order to avoid future adverse consequences, as, for example, agency regulations sometimes

---

[9] Nor is Plaintiffs' ability to challenge the 2020 Rule compromised by waiting for a site-specific
application. As the *NWF* court noted, "[s]uch an intervention may ultimately have the effect of
requiring a regulation, a series of regulations, or even a whole 'program' to be revised . . . in order
to avoid the unlawful results that the court discerns." *NWF*, 497 U.S. at 894.

force immediate compliance through fear of future sanctions." *OFA*, 523 U.S. at 734. But the 2020 Rule does not. Rather, the 2020 Rule simply "provide[s] direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable." 40 C.F.R. § 1500.1(b). After the 2020 Rule has been implemented and applied to a particular proposed action, Plaintiffs are free to challenge the agency's application of the 2020 Rule to that action and the resulting decision. *Cf. NPHA*, 538 U.S. at 810-11 (recommending that approach in a similar context). Indeed, until an agency applies the 2020 Rule to a project in a manner that Plaintiffs believe harms their interests, it is unclear *how* Plaintiffs could modify their conduct in response to the 2020 Rule, even if they desired to do so.

Because the harms allegedly derived by Plaintiffs from the 2020 Rule are not concrete and the 2020 Rule does not direct changes to their primary conduct, they suffer no hardship waiting for a site-specific application of the 2020 Rule before bringing their challenge.

* * *

In short, whether applying the ordinary rule applicable to facial, pre-enforcement challenges of regulations or applying the two-factor *Abbott Laboratories* test, Plaintiffs' claims are not ripe. When agencies have applied the 2020 Rule to a specific action in a manner that causes harm to Plaintiffs, Plaintiffs are free to seek review of that decision. "The case-by-case approach that this requires is understandably frustrating to an organization . . . which has as its objective [an] across-the-board" goal, "[b]ut [it] is the traditional, and remains the normal, mode of operation of the courts." *NWF*, 497 U.S. at 894. "Except where Congress explicitly provides for [the courts'] correction of the administrative process at a higher level of generality, [courts] intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an

actual or immediately threatened effect." *Id.* Accordingly, Plaintiffs' challenge should be dismissed as unripe.

## II.    In the Absence of a Live Dispute over a Concrete, Site-Specific Application of the 2020 Rule, Plaintiffs Lack Standing

For similar reasons, Plaintiffs' speculation about potential future injuries is insufficient to establish Article III standing. To establish standing, a plaintiff must allege facts showing: (1) that it suffered an injury-in-fact, (2) that such injury is fairly traceable to the defendant's conduct, and (3) that it is "likely," and not "merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation and internal quotation marks omitted). Standing must exist at the time the complaint is filed. *Id.* at 570 n.5. "Where, as here, a case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations and quotation marks omitted).

An organizational plaintiff can establish standing on behalf of itself or its members. First, an organizational plaintiff may establish "associational standing" based on injury to its members by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Alternatively, to show standing on its own behalf (so-called "organizational standing"), "the organization itself must meet the same standing test that applies to individuals." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (alterations and internal quotation marks omitted).

A straightforward application of the Supreme Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), demonstrates that Plaintiffs—either on behalf of themselves or their

members—lack standing to challenge the 2020 Rule in the absence of a concrete application of the rule to a particular project that harms them. Even if the Court looks beyond *Summers*, Plaintiffs' three types of alleged injuries—substantive, procedural, and informational—each suffer additional deficiencies, discussed below, that render them insufficient to establish standing at this time.

### A.   *Summers* Forecloses Plaintiffs' Claim to Article III Standing

Like the respondents in *Summers*, Plaintiffs challenge a rule that "neither require[s] nor forbid[s] any action" on their part. "[W]hen the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Plaintiffs "can demonstrate standing only if application of the [2020 Rule] by the Government will affect *them*" by threatening an "actual and imminent, not conjectural or hypothetical" injury. *Summers*, 555 U.S. at 493-494 (emphasis in original); *see also Nat. Res. Def. Council v. Bodine*, --- F. Supp. 3d ---, No. 20 Civ. 3058 (CM), 2020 WL 3838017, at *11 (S.D.N.Y. July 8, 2020) (holding that "conjecture" based upon "a chain of possibilities . . . does not comport with Article III's requirement that an injury be . . . 'actual or imminent, not conjectural or hypothetical.'" (quoting *Spokeo, Inc.*, 136 S. Ct. at 1548)). These requirements ensure "that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.'" *Summers*, 555 U.S. at 493 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)).

In *Summers*, environmental organizations challenged the Forest Service's regulations exempting certain projects from the notice, comment, and appeal process used by the agency for significant projects. 555 U.S. at 490-91. The organizations challenged the regulations both facially and with respect to a particular application of the regulations to the Burnt Ridge Project. *Id.* at 491.

The parties settled their dispute concerning the Burnt Ridge Project, leaving only the organizations' facial challenge. *Id.* at 491-92, 494. In the absence of the dispute over the Burnt Ridge Project, the Supreme Court held that the organizations failed to demonstrate that the government had applied the regulations to any other particular project that would imminently harm one of their members. *Id.* at 492-96. The Supreme Court held that to find standing absent a challenge to a "concrete application that threatens imminent harm to [their] interests . . . would fly in the face of Article III's injury-in-fact requirement." *Id.* at 493.

Plaintiffs' challenge, untethered from a concrete factual context, mirrors *Summers*. Plaintiffs assert concerns that the 2020 Rule will result in future project approvals less protective of the environment, predictions of diminished access to information and public participation, and projected resource expenditures on future litigation, information gathering, and commenting. *See* Compl. ¶¶ 23-24, 30-35, 36, 41-42, 43-44, 48, 52-53, 54-56; 60-63; 65-66, 68, 69-70; 71-74; 79, 82, 85-86, 87-91, 100, 101-104; 108, 109-111. These alleged harms result only from a chain of possibilities too conjectural to satisfy Article III.

As an initial matter, Plaintiffs do not challenge any specific application of the 2020 Rule to a particular proposed action, and their alleged injuries thus require speculation as to when and where the 2020 Rule will be applied in a manner that harms them. *See, e.g.*, Compl. ¶¶ 29-30 ("Although the [Houston Ship Expansion Channel Improvement Project] has already undergone NEPA review, *other current and future projects will be needed to handle the anticipated future growth at the terminal* . . . . Ms. Arellano is reasonably concerned that, as a result of the 2020 Rule, *environmental review of projects necessary to handle the anticipated future growth* at the Port of Houston will fail to consider the cumulative and indirect impacts of these projects . . . ." (emphasis added)); *id.* ¶ 40 ("The I-710 expansion project is currently undergoing NEPA review. . . . [T]he

Department of Transportation *can be expected to apply* the 2020 Rule to the NEPA review of the I-710 expansion project." (emphasis added)).

Even if Plaintiffs could identify a specific project that would apply the 2020 Rule, they can only hypothesize *how* it would be applied, until the agency takes a final agency action with respect to a proposed action. The heart of Plaintiffs' claimed future injury rests on the possibility that federal agencies will fail to consider the indirect and cumulative impacts of pending and future projects. *See, e.g.*, Compl. ¶¶ 32-34; 36; 41-42, 44, 48, 52-53, 65-66; 68, 70, 108. But the 2020 Rule requires agencies to consider all "those effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action" consistent with case law that bounded all effects analysis even under the prior regulation. 85 Fed. Reg. at 43,331. And the 2020 Rule's proximate-cause requirement tracks the Supreme Court's long-standing approach to interpreting the bounds of what is required from a NEPA analysis. *See Public Citizen*, 541 U.S. at 767. Agencies considering pending or future projects may well consider all of the impacts that Plaintiffs worry they will not under these standards. Even before the reforms, NEPA analysis was not limitless. Plaintiffs' allegations regarding impacts agencies may or may not consider in future, hypothetical projects is at best conjectural and, at worst, unfounded—a far cry from what Article III requires. *See NRDC*, 2020 WL 3838017, at *11.

Similarly, Plaintiffs also contend that the 2020 Rule's exclusion of projects with "minimal Federal funding" from the definition of "major federal actions," will result in otherwise-qualifying projects not undergoing NEPA review. *See, e.g.*, Compl. ¶ 69. But Plaintiffs do not identify any projects that have in fact been excluded from NEPA review based on the 2020 Rule. And even in the hypothetical, it is not clear what new projects will be exempted; the 2020 Rule tracks numerous judicial decisions holding "that non-Federal projects with minimal Federal funding or minimal

Federal involvement such that the agency cannot control the outcome of the project are not major Federal actions." 85 Fed. Reg. at 43,347 (collecting decisions). Plaintiffs can only speculate that projects will not undergo NEPA review under the 2020 Rule, but would have undergone NEPA review previously. But *Summers* teaches that environmental organizations lack standing to challenge regulations excluding some projects from procedural requirements in the absence of an imminent site-specific application that would harm the plaintiffs. *See Summers*, 555 U.S. at 492-97. If a concrete harm materializes in the future, Plaintiffs can bring an action against the relevant agency relating to the specific project with a concrete set of facts.

In short, Article III requires that Plaintiffs do more than plead that the 2020 Rule *could* cause *some* federal agencies to apply the 2020 Rule to *future* NEPA reviews in a manner that *could* lead to some type of harm. *See NRDC*, 2020 WL 3838017, at *9-10 (holding that plaintiffs' "fear that their members have of facing increased exposure to a risk of environmental harm—as opposed to actual exposure to pollution"—was "built on multiple layers of speculation" that does not satisfy Article III). It is well established that "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). As the Supreme Court recognized in *Summers*, only concrete applications of regulations can cause injuries sufficient to satisfy Article III. Thus, Plaintiffs must challenge a concrete application of the 2020 Rule to establish standing. Programmatic challenges disconnected from specific applications of the program (such as through a project approval) are "rarely if ever appropriate for federal-court adjudication." *Defs. of Wildlife*, 504 U.S. at 568 (quoting *Allen*, 468 U.S. at 759-60). Here, Plaintiffs' claims are premised on future injuries that will occur only if and when a future agency action is analyzed under the 2020 Rule *and* that action is implemented in a place and manner that

harms Plaintiffs' interests. Plaintiffs' allegations are far from the concrete application required by *Summers* for an injury-in-fact sufficient to support standing.[10]

### B.    Each of Plaintiffs' Theories of Injury Suffer Additional Defects

The Court need not look any further than *Summers* to grant Defendants' motion to dismiss, as Plaintiffs have not alleged an injury in fact sufficient to support Article III standing. But, Plaintiffs' allegations of substantive, procedural, and informational harms each fail to establish standing for additional reasons. Absent a site-specific allegation of harm traceable to "the incremental environmental effect the new regulation would allegedly cause," *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (*en banc*), Plaintiff's theory that environmental damage will harm their religious, aesthetic, scientific, and recreational interests amounts to little more than a generalized grievance. Procedural injuries on their own are not the sort that confer Article III standing. And Plaintiffs' claim that the 2020 Rule will deprive them of information (and that they will have to divert resources to cure the deprivation) does not provide standing absent a statute mandating disclosure of that information for the purposes for which a plaintiff seeks to use it. Each theory is discussed below in turn.

### 1.    Plaintiffs' Allegations of Substantive Harm Do Not Confer Standing

Absent a site-specific instantiation attributable to each of the particular regulatory changes Plaintiffs wish to challenge, Plaintiffs' claims that the 2020 Rule will result in environmental damage that harms their religious, aesthetic, and recreational interests does not differentiate them

---

[10] Cases such as *N.Y. Public Interest Research Group v. Whitman*, 321 F.3d 316 (2d Cir. 2003), and *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003), which suggest that uncertainty about or increased exposure to risk of environmental harm may be sufficient to establish standing, do not change this result. As this Court has noted, more recent Supreme Court and Second Circuit law "call[] [their] continuing viability into question." *NRDC*, 2020 WL 3838017, at *10. In any event, "the allegations of injury made by the plaintiffs in [those] case[s] were far more concrete than those at issue here." *Id.*

from the public at large. And absent a concrete project, their more specific allegations of substantive harm are not yet traceable to the 2020 Rule. For both reasons, their allegations of substantive harm fail to establish their Article III standing.

<blockquote>

**a. Generalized Allegations of Environmental Injury Are Insufficient to Satisfy Article III**

</blockquote>

Plaintiffs believe that the 2020 Rule will harm the environment. But until that rule is applied to actions in a manner that harms them, their interest in the 2020 Rule remains the same as anyone else's: an "undifferentiated, generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007). But "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Schlesinger*, 418 U.S. at 220. "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive," not private plaintiffs. *Defs. of Wildlife*, 504 U.S. at 576; *see also McCrory v. Adm'r of the Fed. Emergency Mgm't Agency*, 22 F. Supp. 3d 279, 291 (S.D.N.Y. 2014), *aff'd* 600 F. App'x 807 (2d Cir. 2015) ("A litigant 'raising only a generally available grievance about government—claiming only harm to [her] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits [her] that it does the public at large—does not state an Article III case or controversy.'" (quoting *Hollingsworth*, 570 U.S. at 706)).

Given that NEPA applies broadly to all major Federal actions significantly affecting the environment, every member of the public may have an attenuated interest in the manner in which the 2020 Rule could be applied to future projects that affect their interests. But the prohibition on generalized grievances prevents Plaintiffs from bringing suit to remedy injuries shared in common with the public. *See Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 258-60 (D.C.

Cir. 1983) ("A sincere, vigorous interest in the action challenged, or in the provisions of law allegedly violated, will not do to establish standing if the party's interest is purely ideological, uncoupled from any injury in fact, or tied only to an undifferentiated injury common to all members of the public"). Plaintiffs' alleged injuries will result, if at all, only from future applications of the 2020 Rule to particular proposed actions, and final agency decisions made with respect to the proposed actions. Until those applications occur, Plaintiffs are in no different a position from the general public and accordingly lack standing.

**b.  Plaintiffs' Alleged Substantive Injuries Are Not Traceable to the 2020 Rule**

In an attempt to specify their generalized grievance, Plaintiffs point to projects that they "anticipate[]"—*i.e.*, speculate—will occur and to which the 2020 Rule may be applied. *See, e.g.*, Compl. ¶ 29 ("Although the [Houston Ship Expansion Channel Improvement Project] has already undergone NEPA review, other current and future projects will be needed to handle the anticipated future growth at the terminal."); *id.* ¶ 40 ("[T]he Department of Transportation can be expected to apply the 2020 Rule to the NEPA review of the I-710 expansion project."); *id.* ¶ 52 (allegation of possible application of 2020 Rule to "the Colton railyard project and other similar projects"). Tracing the specific harms alleged by Plaintiffs to the 2020 Rule requires an attenuated and speculative chain of causation, involving multiple links of decisions by third parties. This chain stretches Article III traceability well past its breaking point.

Where a claim of injury rests on the actions of a third party, a plaintiff must demonstrate "'a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Ziemba v. Rell*, 409 F.3d 553, 555-56 (2d Cir. 2005) (quoting *Defs. of Wildlife*, 504 U.S. at 560). Even when challenging an actual NEPA EIS by an agency—setting aside that the issue here is merely the regulations other agencies

will use to prepare EISs *in the future*—a "plaintiff lacks standing" unless it can show that "there is a *substantial* probability that the substantive agency action . . . created a *demonstrable* risk, or caused a demonstrable increase in an existing risk, of injury *to the particularized interests* of the plaintiff . . . ." *Fla. Audubon Soc'y*, 94 F.3d at 669 (internal citation omitted) (emphasis added); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (emphasizing the Court's traditional "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"); *NRDC*, 2020 WL 3838017, at *11 (lack of reporting about environmental effects was not traceable to the plaintiffs' alleged injury, *i.e.*, that "members would not know whether they are being exposed to more pollution," rendering them less capable "to take steps to protect themselves") (quotation marks omitted)). To do so, "plaintiff must show a causal connection between the challenged change in federal regulation—and the incremental environmental effect the new regulation would allegedly cause—and the alleged injury to the particularized interests of the plaintiff." *Fla. Audubon*, 94 F.3d at 665.

The speculative chain required to link the challenged action—the 2020 Rule—to Plaintiffs' alleged substantive harms—for example, harm to religious interests in performing water ceremonies, *see* Compl. ¶ 35—does not establish the "substantial probability" of occurrence required for Article III causation, nor that "incremental environmental effects" will be caused by the particular regulatory changes challenged. Plaintiffs' theory of injury requires the Court to speculate about how agencies not party to this litigation will modify their agency-specific procedures and apply the 2020 Rule. Those agencies must consider proposed actions in areas where Plaintiffs' members live and recreate. The Court must conclude that those agencies will conduct NEPA review on new projects that differs materially from how they have proceeded under the old regulations. Agencies must make decisions as a result of the modified NEPA analysis that

they would not have otherwise approved. Those decisions must result in incremental environmental effects attributable to the new regulation. Those effects must cause harm to Plaintiffs. Finally, the relevant regulators will have to fail to prevent the harms.

Because of this attenuated causal chain, Plaintiffs cannot connect the 2020 Rule—a broad, government-wide procedural regulation—to specific harms. Their allegations depend upon numerous assumptions, many of which are in the control of independent third parties, coming to fruition. Such a "speculative chain of possibilities" is insufficient to establish that Plaintiffs' alleged injuries based on potential future projects are "fairly traceable" to the rule. *Clapper*, 568 U.S. at 414; *NRDC*, 2020 WL 3838017, at *11-12.

## 2.   Plaintiffs' Alleged Procedural Injuries Do Not Satisfy Article III

Plaintiffs also allege that the 2020 Rule harms them by constraining their ability to comment during the NEPA process and to seek judicial review. *See, e.g.*, Compl. ¶ 104. The Supreme Court, however, has squarely rejected the argument that a purely procedural harm can support standing. In *Summers*, the respondents—like Plaintiffs here—argued that they had standing because the challenged regulations would reduce their ability to influence agency actions through public comment. 555 U.S. at 496. The Supreme Court rejected that argument, holding that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.*; *see also Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010). Because the respondents in *Summers* failed to challenge a concrete application of the regulations, the Supreme Court found that the alleged procedural violation was not justiciable. *See Summers*, 555 U.S. at 497. Plaintiffs' alleged procedural injury suffers the same flaw. Until the 2020 Rule is applied in the context of a specific project, Plaintiffs' alleged procedural injury is insufficient to establish standing. *See*

*Spokeo, Inc.*, 136 S. Ct. at 1549 ("a bare procedural violation, divorced from any concrete harm," cannot satisfy the injury-in-fact requirement).

### 3.   Plaintiffs' Alleged Informational Injuries Do Not Satisfy Article III

Plaintiffs allege that the 2020 Rule impairs their missions because it "depriv[es] [them] of information [they] need to fully understand the health and environmental impacts of proposed actions and to educate [their] members." Compl. ¶ 36; *see also, e.g.*, *id.* ¶¶ 23, 44. Plaintiffs also allege that they must "divert [their] resources from [their] core activities to fill the informational gaps created by the Rule." *Id.* ¶ 56; *see also, e.g.*, *id.* ¶¶ 71-72, 74, 90-91. Here, Plaintiffs cannot establish standing because they cannot show that they were denied information to which they were entitled or that any future diversion of resources is attributable to the 2020 Rule.

### a.   NEPA Does Not Create a Statutory Right to Information to Pursue an Educational Mission

To the extent that an informational injury can satisfy the injury-in-fact requirement of standing, a plaintiff must demonstrate that (1) the law entitles the plaintiff to that information, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

In *Federal Election Commission v. Akins,* 524 U.S. 11 (1998), plaintiff voters suffered injury when they were denied specific campaign information that the Federal Election Campaign Act required be disclosed. In *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440 (1989), plaintiffs were injured by the denial of access to information required to be disclosed under the Freedom of Information Act ("FOIA"). *See also Rey*, 622 F.3d at 1258 (collecting cases). Plaintiffs identify no similar statutory right to the information they seek in the present case. *Cf. NRDC*, 2020 WL 3838017, at *8. While NEPA requires copies of any EIS prepared and comments received be made available to the public under FOIA, *see* 42 U.S.C. § 4332(2)(C), nothing in NEPA's text

reveals a congressional intent to confer a legally actionable right to specific information on the public. *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir. 1991). As the D.C. Circuit explained in *Lyng*, if informational injury under NEPA was sufficient to sustain standing, "[i]t would potentially eliminate any standing requirement in NEPA cases" because any member of the public could always allege a right to more information. *Id.* at 84-85; *see also Atl. States Legal Found. v. Babbitt*, 140 F. Supp. 2d 185, 194 (N.D.N.Y. 2001) ("It is clear that the notion of informational harm, without more, does not confer standing in a NEPA case as it is inconsistent with the requirement of establishing concrete and particularized harm," and "[t]o hold otherwise would allow organizational plaintiffs . . . to undermine the established principals of standing in NEPA cases by simply requesting that an agency prepare an EIS.").

Even assuming *arguendo* that NEPA created a cognizable right to information, Plaintiffs' claimed informational injury would not confer standing because the type of injury they allege—harm to their education and advocacy interests, *see, e.g.*, Compl. ¶¶ 44, 48, 72, 90-91, 102, 111—is not "the type of harm Congress sought to prevent by requiring disclosure" under NEPA. *Friends of Animals*, 828 F.3d at 992. The legislative history of NEPA makes clear that Congress required the preparation of EISs so that agencies would develop information "for subsequent reviewers and decisionmakers, both within the executive branch and in the Congress," S. Rep. No. 91-296, at 20 (1969), not to inform the general public.[11]

---

[11] Although NEPA requires public disclosure of EISs consistent with the requirements of FOIA, *see* 42 U.S.C. § 4332(2)(C), those benefits are incidental to NEPA's primary mandate of informed decisionmaking. Further, FOIA requires an agency to disclose only existing documents, not develop additional information. *See Forsham v. Harris*, 445 U.S. 169, 186 (1980). Plaintiffs here do not seek disclosure of existing, non-FOIA exempt EISs, as was found sufficient to establish informational standing in *Public Citizen*. 491 U.S. at 449. Rather, they are asking the Court to hold that, as a statutory matter, Congress intended NEPA to require agencies to develop and include certain information in EISs and created in the public a cognizable right to that information.

Accordingly, Plaintiffs have not alleged that the 2020 Rule deprives them of information in a manner that would confer Article III standing.

### b. Plaintiffs' Anticipated "Diversion of Resources" Does Not Confer Standing

Plaintiffs attempt to transform their alleged informational injury by alleging that the loss of information will require them to divert their resources to develop information in order to pursue their educational and advocacy missions. Although an entity may establish an injury by showing that a defendant's conduct "perceptibl[y] impair[s]" its ability to provide services, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017), injury may not be based on an entity's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Here, Plaintiffs assert nothing more than harm to their advocacy interests, insufficient to establish standing under *Sierra Club*.

Since *Sierra Club*, courts have interpreted Article III to require an entity to show "actual injury beyond allegations that governmental action merely runs contrary to [its] advocacy interests." *Taylor v. Bernanke*, No. 13 Civ. 1013, 2013 WL 4811222, at *11 (E.D.N.Y. Sept. 9, 2013) (explaining that allegations that a defendant's actions have harmed an organization's advocacy efforts do not confer standing, absent a direct conflict with organization's mission); *see also, e.g.*, *Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 925 (D.C. Cir. 2015) (Henderson, J., concurring) ("[A]n organization's expenditure of resources to educate its members and others regarding government action or inaction does not present an injury in fact.") (internal quotation marks and alterations omitted); *Center for Food Safety v. Price*, No. 17 Civ. 3833 (VSB), 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 8, 2018) (Organizations lacked standing to challenge regulations that would allegedly cause the organization to divert resources to counteract the

regulation at issue because "to allow standing based on these allegations alone would mean that any entity that spends money on an issue of particular interest to it would have standing.").

Plaintiffs' complained-of harms are the type of advocacy-related activities that have been found insufficient to confer standing. For example, Plaintiffs complain of their need to fill the informational gap attributable to the 2020 Rule in order to educate their members, advance certain policy objectives, and fulfill their missions. *See, e.g.*, Compl. ¶ 44 ("EYCEJ relies on NEPA environmental review documents, including cumulative and indirect impact analyses, to identify risks, determine its advocacy priorities, and educate members about the impacts of proposed federal actions," and the 2020 Rule "will impede EYCEJ's work by depriving it of vital information it uses to guide its work."); *id.* ¶ 48 ("The 2020 Rule perceptibly impairs NJEJA's work by depriving it of information it needs— and is entitled to—to fully evaluate the negative impacts that projects will have on communities of color and low-income communities, educate its members, and influence the federal decisionmaking process."); *see also, e.g., id.* ¶¶ 72, 90-91, 102, 111. If Plaintiffs decide in the future to spend resources submitting requests for supplemental information or collecting information on their own, *see, e.g.*, Compl. ¶¶ 56, 72, 90, those decisions do not amount to cognizable harms. *See, e.g., CASA de Md., Inc. v. Trump*, 971 F.3d 220, 239 (4th Cir. 2020) ("[A] voluntary budgetary decision, however well-intentioned, does not constitute Article III injury, in no small part because holding otherwise would give carte blanche for any organization to 'manufacture standing by choosing to make expenditures' about its public policy of choice." (quoting *Clapper*, 568 U.S. at 402)); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011); *see also Sierra Club*, 405 U.S. at 738; *Taylor*, 2013 WL 4811222, at *11.

*Chesapeake Climate Action Network v. Export-Import Bank of the United States*, 78 F. Supp. 3d 208 (D.D.C. 2015), is illustrative. There, the plaintiffs challenged the Export-Import Bank's decision to guarantee a $100 million loan from a private bank to Xcoal, a company exporting coal from the United States to Asia. The plaintiffs alleged that the Export-Import Bank, an agency of the United States, erred in failing to prepare an EIS under NEPA for the loan guarantee, and that as a consequence they suffered an informational injury to their interests in educating the public about coal financing and its potential effects, and to their efforts to advocate for sustainable energy policy. *Id.* at 233. The Court rejected this theory of standing. It found that "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing," and that the plaintiffs had not shown that the loss of NEPA information impaired their organizational purpose. *See id.* at 234 (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996)). So too here. Like the plaintiffs in *Chesapeake Climate Action*, Plaintiffs here fear that the 2020 Rule will reduce the NEPA information they can access, which they use to educate the public and advocate on the propriety of federal actions. This is the "type of abstract concern that does not impart standing." *Id.* at 234.

### c.  Plaintiffs' Alleged Informational Injuries Are Speculative

Even if the informational injury discussed above were actionable under some circumstances, Plaintiffs are not excused from their burden to demonstrate that the alleged deprivation of that information is concrete and imminent rather than speculative. *Spokeo*, 136 S. Ct. at 1549-50. The 2020 Rule itself does not itself take any information away from Plaintiffs. As noted above, until agencies implement the 2020 Rule and propose actions under the Rule and their own new procedures, Plaintiffs' alleged informational injury remains impermissibly speculative; it cannot be known now whether there will be a change in the amount of information

received by Plaintiffs about projects or activities that concern their interests, or how that change in information will impact their education and advocacy. *Summers*, 555 U.S. at 496-97.

* * *

In sum, Plaintiffs' claim to standing, whether premised on substantive, procedural, or informational injuries, is premised on an attenuated series of speculations and inferences. Rather than indulge Plaintiffs' desire to challenge the 2020 Rule on its face before even a single agency has issued its own implementing procedures or taken an action under the 2020 Rule, the Court should dismiss this case as unripe and for lack of standing.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated: November 17, 2020
     New York, New York

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney of the
Southern District of New York

By:   */s/ Danielle J. Levine*
     DANIELLE J. LEVINE
     ZACHARY BANNON
     Assistant United States Attorneys
     86 Chambers Street, Third Floor
     New York, New York 10007
     Tel.: (212) 637-2689/2728
     Fax: (212) 637-2702
     E-mail: danielle.levine@usdoj.gov
            zachary.bannon@usdoj.gov

JOHNATHAN BRIGHTBILL
Principal Deputy Assistant
Attorney General

PAUL SALAMANCA
Deputy Assistant Attorney General

35